**PEARSON et al. v. UNITED STATES.**

No. 11298.

United States Court of Appeals
Sixth Circuit.

Nov. 26, 1951.

Thomas C. Farnsworth and Edward N. Vaden, Asst. U. S. Atty., Memphis, Tenn. (John Brown, Thomas C. Farnsworth and Edward N. Vaden, Memphis, Tenn., on the brief), for appellee.

L. E. Gwinn, Memphis, Tenn., and Thomas L. Robinson, Memphis, Tenn. (Thomas L. Robinson, R. Garland Draper and L. E. Gwinn, Memphis, Tenn., on the brief), for appellants.

Before HICKS, Chief Judge, and SIMONS and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This case, involving a complicated factual situation, arises out of the hijacking of a large truckload of whiskey. The four appellants were convicted, on circumstantial evidence, of receiving and having in their possession liquor which had been stolen from a shipment in interstate commerce, with knowledge that the same had been stolen. Each appellant was sentenced to a term of ten years. In addition, appellants Pearson and Tinsley were sentenced to pay fines of $5,000 each and appellants Maxwell and Twitty, to fines of $500 each. Appellants' principal contention on appeal is that there was no substantial evidence to sustain their convictions. Other claims of error are also made and will hereafter be discussed. The following are the facts surrounding the robbery:

Herschel Helm was a truck driver employed by George A. Mueller & Company, a concern engaged in the wholesale liquor business, with its principal place of business in Springfield, Illinois. On instructions from the Mueller Company, Helm, driving a Mack truck and trailer, proceeded to Lawrenceburg, Indiana, on the night of December 29, 1949, to procure a load of liquor which the company had ordered from the Schenley Distilling Company. On the next day, December 30, 1949, the liquor, consisting of 540 cases, valued at $22,711.12, was loaded on his truck by Schenley employees. Helm pulled out of Lawrenceburg about noon, and on order of his company, proceeded to Cairo, Illinois, where he was to deliver a portion of his cargo to the J. B. Wenger Company. From Cairo he was then to continue on to Springfield, Illinois, to deliver the balance of the liquor to his employer, the Mueller Company. What follows is Helm's testimony, and since it is undisputed, and the jury, by its verdict, found in accord, it is to be accepted as proof of the facts therein set forth.

Driving from Indiana across Southern Illinois on his way to Cairo, Helm had arrived at Vienna, Illinois, a small town north of Cairo, about eight o'clock at night on December 30. At that hour, it was past the time when he could drive his load inside the yard of the liquor warehouse of the Wenger Company in Cairo, and the warehouse itself would not be open for business until eight o'clock the next morning. Accordingly, Helm spent the night in Vienna at a small hotel patronized by truckers, intending to drive to Cairo the next morning, parking his truck and trailer just off highway 146, in front of the hotel. About seven o'clock the next morning, December 31, Helm started from Vienna with his truck and trailer toward Cairo, and, after traveling about fifteen miles, while proceeding up a grade in low gear, at a point near the village of Cypress, Illinois, he was ordered to stop by a masked man, who was standing in the open door of a car that had been driven up alongside the left or driver's side of the truck, and who covered Helm with a pistol. Another

man was driving the hijack car, but Helm could not see his face, and, because of the mask of the hold-up bandit and because his attention was centered on the gun, Helm was unable to give any description of him. He estimated that the hold-up took place about 7:30 A. M.

As soon as Helm stopped, the armed man got into the truck, pushing him over to the right. At the time Helm was wearing a zipper coat, which the hijacker pulled over his head, at the same time pulling the zipper over his face, effectually blindfolding him. He was then ordered to get out of the truck and led to the hold-up car, where he was forced to crouch on the floor in front of the driver's seat. The car was then driven away; later it was stopped and Helm was taken out and placed in the back of the car, where he was obliged to lie down, after his eyes were taped, and a burlap sack pulled down over his head. The car was then continuously driven along the highways until about three o'clock in the afternoon, when Helm was removed from the car and the tape taken from his eyes. The zipper coat was again pulled up over his face, his hands were tied behind him and he was left lying in the weeds by the side of the road, as the car drove away. After working his hands loose, and pulling the coat from his face, Helm walked about a quarter of a mile until he came to a tavern, near East St. Louis, Illinois, about 200 miles northwest of the scene of the hijacking. He then called the state police to report the robbery; and they arrived shortly thereafter. Helm did not know whether there was one man, or two, in the car in which he was driven away after the hijacking; but his impression was that there was only one.

Subsequent to the hijacking, the next that was heard of Helm's truck and the load of whiskey, as disclosed by the evidence, was about an hour after the robbery, when the truck and trailer were driven by an unknown man up to an intersection of two highways at Paducah, Kentucky, which is about thirty miles from Cypress. Appellant Pearson testified that he was at that point waiting for the delivery of a truckload of liquor, which he had purchased from one Leo Terrell the day before; that the driver of Helm's truck, who was not known to him, approached and told him he was Terrell's driver, and thereupon turned the truck over to him. This was about 8:30 in the morning. Pearson then immediately had Maxwell, one of his employees, drive the truck and trailer down through the states of Kentucky and Tennessee. Maxwell stated that from the time he got into the truck at Paducah, he drove without stopping until he reached the destination that Pearson had indicated, just outside of Memphis, Tennessee. Pearson and Tinsley, a guard employed by Pearson in his liquor business, preceded or followed the truck. They finally reached the point outside the city of Memphis, where they planned to stop, and some time after noon, drove into a tourist court, owned by Frank Belluomini. Belluomini, upon Pearson's request, undertook to find some negro farmhands and laborers to transfer the liquor to another truck, and proceeded down to a corner of the highways in a car driven by Tinsley. In the meantime, Pearson arranged to have an empty International truck brought over to the tourist court by his brother, who lived in the vicinity. Belluomini and Tinsley were successful in procuring the workers, and returned to the tourist court within about fifteen minutes. The International truck, which Pearson had arranged for by telephone, was shortly thereafter driven up to the place by Pearson's brother, and backed up to the side door of the truck that had been hijacked. The cargo of 540 cases of liquor was thereupon transferred from the hijacked truck to the International truck by the workers. Pearson then asked Belluomini if he could leave the newly loaded International truck at the tourist court overnight, and, upon being informed that he could, the hijacked truck was immediately driven away by Maxwell. With Maxwell in the truck was one of the workers, Elbert Smith, who had helped to transfer the liquor. Pearson and Tinsley drove ahead of the truck in a car. They proceeded ninety miles north to Dyersburg, Tennessee, thence to Tiptonville, and across the Mississippi River on a ferry into

Missouri. They then drove their car and truck on a highway to a point about two miles from Risco, Missouri. There, at night, in the darkness, the truck was driven about 200 yards off the main highway and then for a distance of 75 feet on to a ditch-dump road—which is a narrow road of dirt, made when a drainage ditch is dug, and the earth from the ditch levelled off above and at one side of the ditch. Risco is approximately 135 miles north, and slightly east of Memphis. It is 70 miles southwest of Cairo, Illinois, and 125 miles west of Union City, Tennessee, where Leo Terrell, the man from whom Pearson claimed to have bought the liquor, lived. That same night, New Year's Eve, on which the truck and tractor had been driven to Risco, Pearson, Tinsley, the truck driver Maxwell, and Smith, drove back in their car to Memphis, arriving about midnight.

The truck and tractor remained on the ditch-dump road for some time, until it was noticed by a farmer living in the neighborhood, who, on January 8, 1950, notified the sheriff of New Madrid County, Missouri, of the circumstance. The sheriff came out on January 10, 1950, ordered the truck and tractor to be taken to the jailyard at New Madrid, the county seat, and informed the Missouri State Police of the matter. The state police immediately, in turn, notified the office of the Federal Bureau of Investigation at St. Louis, Missouri, and, on the same day, the resident agent of the Bureau at Cape Girardeau, Missouri, came to New Madrid. It was then discovered that the truck belonged to George A. Mueller & Company, of Springfield, Illinois, and was the one that had been hijacked. On January 18, 1950, Herschel Helm arrived in New Madrid, to repossess for his employer the truck which had been taken from him by the hijackers on December 31.

It appears that the hijacking had first been reported to the Federal Bureau of Investigation on January 2, 1950, and on the same day, the Memphis office of the Bureau flashed a notice of the crime to the Tennessee State Highway Patrol, the Memphis Police Department, and the sheriff's office of Shelby County, in which Memphis is located. However, nothing appeared to indicate at that time that the hijacked truck and cargo had entered the state of Tennessee; and it was not until further information was available that an investigation was commenced by the Special Agent in Charge of the Federal Bureau of Investigation in Memphis, on January 18. On January 20, Terrell, who, as heretofore mentioned, according to Pearson's statement, sold him the liquor in question, died. Four days later, on January 24, the first of the arrests was made in the case; and on the next day, Pearson, hearing that he was wanted, went to the offices of the Federal Bureau of Investigation in Memphis, and submitted to arrest, giving bond at once for his release pending trial.

The circumstances relating to Pearson, Tinsley, and Maxwell have been outlined in the foregoing statement. Twitty's connection with the affair arises out of his purchase of two lots of the liquor in question, according to his claim, on January 3 and on January 11, 1950, the government maintaining, however, that while he received the liquor on those dates, he took possession of it with the guilty knowledge that it had been stolen.

We turn, then, to the appellants, their claims, and the evidence upon which the government relies to sustain their convictions. John Pearson, thirty-three years old, had been in the whiskey business for sixteen years, up to the time of his arrest in January, 1950. He was engaged in buying and selling liquor, and transporting it through various stages on his own trucks and on borrowed or rented trucks. The evidence discloses that in the course of his business he purchased great quantities of whiskey from legitimate liquor wholesalers and distillers. He employed numerous persons from time to time, and had licenses from the federal government, as well as various state liquor licenses. A considerable amount of the traffic he engaged in was illicit, being in violation of certain state statutes and local option provisions; and the liquor transported in this case by Pearson was, for some reason, aside from its stolen character, illicit in

the state of Tennessee and other states, probably because of failure to comply with statutes governing its importation and payment of tax. Pearson's explanation of his possession of the stolen liquor within such a short time of the hijacking was, first, that he had contracted to purchase the truckload of liquor the day before the hijacking from Terrell, in Union City, Tennessee; that Terrell had told him that the truckload would be delivered to Pearson at the intersection of highway 65 with highway 45 at Paducah, Kentucky, about 8:30 the next morning; that it was further agreed that Pearson would remove the liquor from the truck in which it was delivered and drive the said truck to a point designated by Terrell, on a ditch-dump road off the main highway near Risco, Missouri, where Terrell might secure it later; that it was further agreed that Pearson would pay Terrell subsequently for the liquor so purchased, when he had ascertained how much was in the truck; and Pearson claims that he actually did pay Terrell for the liquor subsequent to receiving it.

Pearson's answer to the question why the foregoing transaction could not be corroborated was, of course, that Terrell died three weeks after he had purported to sell the liquor to Pearson, and a day or so before the first arrests were made in the case. It is to be said in this connection that the evidence disclosed that Terrell had been engaged in the legitimate sale of liquor in Cairo, Illinois, under the name of Tri-State Liquor Company, and that Pearson had previously bought considerable whiskey from him. It further appears that there was a close association between Pearson and Terrell, and that earlier in December—the month the alleged sale was made by Terrell to Pearson—Terrell had furnished bond for the release of Pearson's brother, Tommy, when the latter had been arrested by the Tennessee police while in charge of a truckload of liquor owned by appellant Pearson, at which time the police also seized the cargo of liquor as contraband.

It may be here said that one of the strong arguments used in Pearson's defense was that his entire record had been free of any suspicion of dealings in stolen liquor during his sixteen years in the business; that he dealt only with legitimate distillers and wholesalers; that his transactions were very extensive and successful; and that his unusually large expenditures in purchases of liquor from recognized business firms made it most improbable that he would risk his standing, his business, and everything he had, on the robbery of a truckload of liquor. It must be granted that the record shows that Pearson was engaged in very extensive transactions in his liquor business.

As indicating the scale of his operations, it appears that during the first two weeks of December, 1949, he paid the J. B. Wenger Company, the wholesale firm in Cairo, $57,500 for purchases of whiskey. On December 27, 1949, Pearson paid more than $13,000 to the J. B. Wenger Company on further purchases; on December 29, he paid $18,741.25; and on December 30, he paid Wenger, on additional purchases, $28,115.50. Thus, in three days, December 27–30, 1949, Pearson paid $60,000 to the Wenger Company on liquor purchases. During the entire month of December, prior to the claimed sale by Terrell, Pearson had paid approximately $120,000 to the Wenger Company for the legitimate purchase of liquor, most of these payments being made in cash.

When, at the time of the last payment on December 30, 1949, Pearson paid Wenger $28,115.50, he arranged to have his truck transport the whiskey from the Wenger Company warehouse at Cairo, Illinois, to Karnak, Illinois, about twenty-five miles north of Cairo, where the liquor was to be transferred to another truck. The reason for such transfer was peculiar, but seems to have been a regular practice among those engaged in the transportation of liquor in that general locality. According to the evidence, it appears that the tax authorities of various states often have watchers near the plants of wholesalers and distillers and notify the police patrols of their states of the license numbers of the trucks carrying away cargoes of liquor. In this way, the trucks are seized and drivers arrested when transporting liquor in those states in viola-

tion of the laws. Pearson himself lost a truckload of liquor in this way to the Tennessee police a few weeks before the incident here in question. Moreover, it appears that criminals also watch the license number of trucks leaving liquor plants, with the view to hijacking these cargoes from time to time, and, according to the government witnesses, such robberies have, in the past, taken place frequently in the vicinity of Cairo.

With the foregoing as a background, it may be more readily understood why Pearson arranged that the liquor which he purchased on December 30 from the Wenger Company be taken in his truck to the village of Karnak, and there transferred to another truck for further transportation to its ultimate destination.

As to Tinsley's relationship with Pearson, as the evidence discloses, he was employed as a guard and driver by Pearson; and Maxwell was nothing more than a truck driver and laborer, also employed by Pearson. A brief discussion of their connection with the affair will be hereafter made, in considering whether the evidence was sufficient to sustain their convictions.

We have described, generally, the hijacking of the liquor cargo, the receiving of the hijacked truck and cargo by Pearson at Paducah, its journey to the tourist court outside Memphis, and the driving of the empty hijacked truck thereafter to a point near Risco, Missouri, where it was found by the sheriff of New Madrid County and later identified by the Federal Bureau of Investigation as the truck that had been hijacked from Helm. At this point it may be helpful to an understanding of the case, to trace the movements and activities of Pearson, Tinsley, and Maxwell, from the time that Pearson made his last purchase of $28,000 worth of liquor from the Wenger Company on December 30, 1949, to the time, the next day, when Pearson, Tinsley, and Maxwell arrived with their truck and car at the outskirts of Memphis—on December 31, 1949.

It appears from the testimony of Pearson and Clyde Bird, a witness upon whom the government relies, that a week or so before the hijacking, Pearson had contracted with Bird to drive his large truck up from Texas, and to meet him at a place north of Cairo on the evening of December 30, for the purpose of transporting liquor. This was an entirely legitimate transaction. There was some misunderstanding as to the exact place of the planned meeting, as will hereafter appear. As we have seen, Pearson, on December 30, then, had sent his truckload of legally purchased liquor, driven by Maxwell, up to Karnak, and followed it himself in a car driven by Daniel Senter, a young man who drove for Pearson, and who was, in many transactions, if not his business associate, at least, held out as one. Senter was a witness for the government, which relies upon his testimony. Both Senter and Pearson testified that when they arrived at Karnak, Bird's empty truck, which Pearson apparently expected to find at that point, was not there. Not finding Bird's truck, Pearson had Senter drive him back and forth on the highways to various points and intersections, in an attempt to locate Bird's truck. On prior occasions there had been similar misunderstandings as to where such transfer trucks were to be, and Senter had driven Pearson about several times, in the general vicinity of Karnak, to locate them.

On the night of December 30, ·Senter drove, or as he said, "sashayed," in the darkness, around the countryside, cutting back and forth on the roads, to find Bird's truck. This was certainly a legitimate quest, but, here, a remarkable circumstance presents itself. Within a few miles of Karnak was the village of Vienna, where Helm's truck—the truck that was later hijacked—was standing just off the road in front of the hotel where Helm was sleeping, at the very time Senter and Pearson were searching for Bird's truck. In fact, Senter says that they drove through Vienna that night, although Pearson denies it. But whether they did, or whether, if they did, Pearson saw Helm's truck or concerned himself with it—whether the circumstances had any connection with the hijacking the next day—is hardly more than speculation. If it was a coincidence, it was a strange one; if it was more than a coincidence,

incriminating evidence is lacking. In any event, they finally located Bird's truck at the intersection at West Vienna, where Bird had pulled up at the side of the road and was taking a nap. West Vienna is just 11 miles from Karnak, where Pearson had expected to find the truck. Pearson wakened Bird, told Senter to drive his car back to Cairo, and to await word from him at the hotel. He also instructed Senter to inform Tinsley to wait around the hotel at Cairo. Pearson then got into Bird's empty truck with him, and drove over to Karnak, where the truckload of liquor was waiting to be transferred or switched.

When Pearson arrived at Karnak, he and Maxwell, his truck driver, who was already there, started to unload the liquor which Pearson had bought earlier that day, from Pearson's truck, and to load it on Bird's truck. Bird also assisted them in this work; and they were later joined by Tinsley, who, apparently, on receiving a message that Pearson wanted him, drove up in his own car from Cairo and helped in the transfer. When the entire cargo had been placed in Bird's truck, Bird started for Missouri, by way of the Cape Girardeau Bridge over the Mississippi, about 25 miles away. Pearson and Tinsley, according to Pearson, followed in Tinsley's car, with Maxwell in the back seat. Nothing can be said to be suspicious about the foregoing transaction. When Bird finally reached the bridge, Pearson testified that he, Tinsley, and Maxwell turned around and came back to Cairo, arriving there between one and two o'clock in the morning. Pearson found Senter asleep in his car in front of the hotel, and, after awakening him, requested the keys of his car, which Senter gave him. They then went into the hotel, where Senter registered and took a room for the night. Pearson also registered, and stated that Tinsley slept that night with him in his room. Maxwell, the negro truck driver, slept that night in Senter's car, which was parked in front of the hotel. The next morning, December 31, about seven o'clock, according to the testimony of Pearson and David Sloan, the assistant manager of the hotel, Pearson checked out of the hotel at Cairo; and shortly after seven o'clock, according to the testimony of Gail Knutsen, the room clerk, Knutsen, Pearson, and Tinsley all had breakfast together. Knutsen further testified that about 7:30 A. M., after breakfast, Pearson took some sandwiches and a beverage out to Maxwell, who was sitting in the car in front of the restaurant. Shortly after 7:30 A. M., according to the testimony of Pearson and Maxwell, Pearson, Tinsley, and Maxwell drove to Paducah, Kentucky, in Senter's car, arriving at the intersection of highway 60 and highway 45 about 8:15 A. M. The unquestioned evidence discloses that Pearson, from Paducah, called Senter at the hotel in Cairo, and requested him to proceed to Karnak, get the empty truck owned by Pearson from which the liquor had been transferred to Bird's truck the night before, and to drive Pearson's truck to Memphis. Senter accordingly went to Karnak in a taxicab, procured Pearson's truck, and brought it to Memphis. As has been said, about 8:30 A. M., the hijacked truck was driven up to the intersection at Paducah, according to Pearson, and turned over to him by a driver who stated that he was delivering it on behalf of Terrell. The truck was, as heretofore mentioned, then driven by Maxwell to the tourist court outside Memphis, with Pearson and Tinsley following in a car.

It is to be noted here that the government contends that if Pearson considered that he had acquired a legitimate load of whiskey in Paducah, there was nothing to keep him from switching that load into his own truck—which was then at Karnak, 25 miles away—instead of having Senter drive the empty truck from Karnak to Memphis; but in Pearson's defense, it is argued that if it was necessary to switch the liquor which Pearson bought in Cairo, to Bird's truck, for its journey into Missouri, in order to throw state authorities off the scent and to keep possible hijackers from following Pearson's truck and seizing its cargo, it was equally necessary to avoid transporting another cargo of whiskey in Pearson's truck, which presumably had been observed coming from the liquor wholesaler's plant on the night before.

The government contends that the activities of Pearson, Tinsley, and Maxwell, in the vicinity of the Helm truck and cargo on the night before the hijacking could be, and were, probably, considered by the jury, as bearing upon their knowledge that the cargo was stolen. The Helm truck, it will be remembered, was at Vienna. Yet the government's own witness, Bird, testified that ten days before the hijacked liquor was ever loaded in Indiana, Pearson had arranged with him to be at West Vienna—a few miles from Vienna—with his empty truck that same night. And Senter, the other government witness, testified that he drove Pearson back and forth in that vicinity that night, in order to look for the empty truck. As heretofore remarked, Pearson was in the vicinity of Vienna and West Vienna on a legitimate quest, and, from the evidence of the government witnesses in the case, the jury would have no more than suspicion to rely upon, to consider that the presence of Pearson, Tinsley, and Maxwell, in the locality indicated complicity in the crime charged against them.

We have already outlined the manner of transferring the cargo from the hijacked truck at the tourist court to the International truck which was brought over by Pearson's brother, and have related how this truck, loaded with the liquor, was left at the tourist court, with the consent of Belluomini, the owner of the court, while the hijacked truck was driven to Missouri. Strangely enough, it was not until two days later that Pearson returned to the tourist court, with Maxwell, and had the International truck, with its cargo of liquor, driven out to the farm of William F. Harris, who lived in the vicinity. Harris was an elderly farmer, well-known in the neighborhood, of good reputation, who had known Pearson all his life, and had been a friend of his parents before he was born. According to the testimony of Harris and Pearson, Pearson asked him if he could store the liquor in a little cabin, where Pearson had previously been allowed to store some wine, and was permitted by Mr. Harris to do so. Thereafter, Pearson brought a number of workers to the place, who removed the liquor from the cases, and

wrapped, or "lugged" the bottles in paper packages of different combinations of sizes and brands. The Illinois state liquor stamps were removed from the bottles before they were so wrapped, and, thereafter, according to Bird, the containers in which the liquor had been originally packed, were destroyed by burning. The federal laws require that such containers be destroyed as soon as the liquor is removed from them, and that was the reason given by Pearson to explain the burning of the cartons. The government submits that it is most significant that although the Pearson family owned several farms in the vicinity of the Harris farm, none of them was used to conceal the whiskey and to change the identity of the whiskey containers; and that such tactics indicate that Pearson was aware that the liquor had been stolen. Pearson's answer, however, was that the Harris farm was used for storing the whiskey, not because he knew it was stolen, but because the state authorities were watching the Pearson farms, having that same month seized a large truckload of whiskey owned by him, and arrested his brother, who was driving the truck.

We come, then, to the question whether the evidence is sufficient to sustain the convictions of appellants, and proceed, first, with the case of Pearson. The offense with which he is charged was the possession of property stolen in interstate commerce, with knowledge that it had been stolen. Scienter is usually a fact to be deduced from the circumstances. As generally stated, the unexplained exclusive possession of stolen property shortly after the commission of larceny or robbery may warrant a finding that the possessor has guilty knowledge. Such a possession must be accounted for in a straightforward, truthful way, and unless the jury finds the explanation reasonable and satisfactory, they may be warranted in returning a verdict of guilty. The possession of recently stolen property, without a reasonable explanation of its possession, consistent with innocence, may be considered by the jury as evidence of guilty knowledge of its stolen character, as such possession, under these circumstances, permits an inference to be drawn that the

possessor knew it was stolen. Brubaker v. United States, 6 Cir., 183 F.2d 894; Murphy v. United States, 6 Cir., 133 F.2d 622; Yielding et al. v. United States, 5 Cir., 173 F.2d 46; Janow v. United States, 5 Cir., 141 F. 2d 1017; Thomas v. United States, 4 Cir., 11 F.2d 27. See Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090.

Pearson, according to his own claim, received and retained exclusive possession of the large cargo of stolen liquor within an hour of the time of the robbery. Was his explanation of his possession truthful and reasonable, or was the jury warranted in refusing to accept it as satisfactory, and in returning a verdict of guilty against him? To resolve this question, we must first examine Pearson's alleged transaction with Terrell. He claimed that the day before the hijacking, he was at Terrell's home at Union City, Tennessee, when Terrell asked him if he could use another load of liquor, and he told Terrell that he could; that Terrell then told him that the truck would be at the intersection of highways 60 and 45 at Paducah, Kentucky, the next morning, at about 8:30. This claimed conversation between Pearson and Terrell was alleged by Pearson to have taken place on the morning of December 30. According to this account, the hijacked truck of liquor was being sold by Terrell to Pearson the day before it was hijacked, and Pearson was told the time and exact place where it would be delivered to him. Now, at the time that the alleged agreement was being entered into between Pearson and Terrell, the hijacked liquor had not yet been loaded on Helm's truck in Lawrenceburg, Indiana, as Helm did not leave the Schenley Distilling plant at that place until about noon. In order to give credence to this alleged conversation and agreement between Pearson and Terrell, the jury would be obliged to find either that Terrell had hijacked the truck or caused it to be hijacked; or that Helm had previously conspired with Terrell to fake the hijacking and deliver over to Terrell his employer's truck and cargo of whiskey. In order to find that Terrell had hijacked the truck or caused it to be hijacked for delivery to Pearson, the jury

would, in effect, be obliged to find that Terrell had a rather unusual prescience; that he would know, on the morning of December 30, that Helm would leave Lawrenceburg, Indiana, a little later the same day; that Helm would drive the Mueller Company truck all the day of December 30 and just miss getting to Cairo that same night; that Helm would stay at Cypress, Illinois, overnight, and would start out at seven o'clock in the morning; that the hijacking would take place fifteen minutes later—just in time for the hijacked truck to be driven with considerable speed to arrive at the highway intersections at Paducah at 8:30 on the morning of December 31, for delivery to Pearson, at the exact place and time that had been specified by Terrell on the morning of the previous day.

In the light of the foregoing, the jury was justified in concluding that Terrell could not, on the morning of December 30, have arranged the hijacking, so as to enable him to agree to have the truck and cargo of hijacked liquor delivered to Pearson at 8:30 A. M. on December 31 at Paducah. At to the contention that Helm had, in all probability, previously conspired with Terrell to fake the hijacking and to deliver the cargo of liquor to Terrell, this claim was strenuously argued to the jury by counsel for Pearson. The government's theory was placed squarely upon the proposition that Helm had been hijacked. The court charged the jury that the government's theory was that Helm had been set upon by hijackers at Cypress, Illinois, and that, in order to convict Pearson, the government was obliged to prove beyond a reasonable doubt that Helm was hijacked, and that his cargo of liquor was taken by the hijackers "through a robbery." The jury, by its verdict finding Pearson guilty, necessarily found that Helm had been actually hijacked, and under the evidence, was amply warranted in so finding. It was further justified in finding that Terrell had not hijacked the cargo; and that Terrell had, therefore, not sold, or purported to sell to Pearson the cargo of liquor which had been stolen from the Mueller Company. Moreover, the jury could consider, in addition to the foregoing, the fact that Pearson

received no invoice for the liquor which he claimed to have purchased, although the Mueller Company had paid nearly $23,000 for it; that there nowhere appeared any evidence of his having paid Terrell or anyone else anything for the liquor, except his own statement that, after he had checked what was in the truck, he agreed with Terrell upon the price to be paid, and paid him that price. But what that price was—what amount of money was paid to Terrell according to Pearson's story—nowhere appears in the record. The claim of such unusual transactions, together with such deficiencies of proof, obviously contributed to induce disbelief on the part of the jury in Pearson's explanation as to his possession of the stolen property shortly after the robbery.

Moreover, the evidence that, as soon as he received the stolen truck of liquor at Paducah, Pearson immediately ordered Maxwell to drive it to the outskirts of Memphis; that the cargo was driven there without stopping; that it was unloaded at once and transferred to another truck; that the hijacked truck was then immediately driven for several hours up through Tennessee, across the Mississippi River, to a deserted spot in the Missouri countryside, and left on a ditch-dump road in the darkness in the late hours of a winter night, may well have indicated to the jury undue haste to transfer the cargo with the object of getting rid of the incriminating stolen truck, at a point in another state, and as far away from Pearson's place of business as possible.

The explanation of Pearson as to driving the empty truck to a point near Risco, Missouri, was, as heretofore mentioned, that it had been agreed with Terrell that the truck would be at that point so that Terrell could later secure it there; and he testified how other empty trucks had, under similar circumstances, been driven to points in that vicinity, in accordance with Terrell's instructions on prior deals. But the jury was not bound to accept this explanation, and might have considered that the dispatch with which the Mueller truck was driven out of the state, contrasted oddly with the leisurely way in which the $23,000 cargo

of liquor which was transferred to the International truck, was left in the open at the Belluomini tourist court for two days and two nights after the empty truck had been driven to Missouri, before the liquor was called for by Pearson and taken to the Harris farm; and, in this regard also, the jury was justified in not accepting Pearson's explanation of the stolen liquor as satisfactory.

Who it was that actually carried out the hijacking does not appear. The evidence does not indicate that Pearson, Tinsley, or Maxwell committed the robbery or helped to commit it. The testimony of the room clerk of the hotel at Cairo places them in that city at the very moment of the hijacking in Cypress. Whoever blindfolded Helm and drove him away was, according to Helm, at a point just outside East St. Louis, Illinois, 300 miles north of Memphis, about the same time that Pearson, Tinsley, and Maxwell were on the outskirts of Memphis at the tourist court; and whoever it was that drove the stolen truck from the scene of the hijacking to Paducah, it was not Pearson, Tinsley, or Maxwell, unless the assistant manager of the hotel at Cairo, and the room clerk, are to be disbelieved; and there appears no motive on their part to risk the penalties of perjury. Of course, they may have been mistaken, but their testimony was direct and forthright, and carried no suggestion of uncertainty.

In this regard, however, the government urged the court to submit to the jury the question whether appellants had established an alibi. It is not discoverable from the record whether the government denominated as an alibi appellants' claim that they were not at the scene of the hijacking—or that they were at the hotel in Cairo on the night of December 30 and on the morning of December 31. In their argument to the jury, government counsel claimed that the testimony of the hotel clerk and the room clerk that Pearson, Tinsley, and Maxwell, were in Cairo on the night before the hijacking, was "a fabricated alibi." But, apparently, in view of the fact that there was no evidence that appellants were present at the hijacking, and that there was strong evidence that they were not, the district

court disagreed with the government, and refused to instruct as it requested, stating that, after serious consideration, it had come to the conclusion that it was not a case for an instruction on alibi.

The only way in which the jury could reasonably conclude that Pearson was innocent of complicity and that he received the cargo of liquor with no knowledge that it had been stolen, would be to find that the hijacking was faked and that Helm had delivered the Mueller Company cargo to Terrell, pursuant to a conspiracy between them; and that Terrell caused the liquor to be delivered thereafter to Pearson. But the jury's finding, as has been said, was directly contrary to such an assumption and contention.

■ Giving due consideration to the evidence tending to sustain Pearson's defense —that he had formerly purchased large quantities of liquor from Terrell; that Terrell was a recognized liquor dealer in Cairo, with a regular place of business; that Pearson had dealt informally with Terrell, without receipts or invoices; that payments in cash of thousands of dollars were customarily made by him for such purchases, rather than by check; that the stolen truck with its cargo was handled by Pearson in accordance with Terrell's directions, in the belief that it was a legitimate cargo, in the same way that he had done with his other legal purchases in the past—nevertheless, it is our conclusion that, in considering all the surrounding circumstances in the case, and the transactions themselves, the jury was clearly warranted in refusing to accept Pearson's explanation of his possession of the stolen cargo; and that its verdict of his guilt was sustained by substantial evidence.

We come, then, to the question whether there was substantial evidence to sustain the convictions of Tinsley and Maxwell. They were charged with the commission of the same offense as Pearson, namely, the unlawful receipt and possession of property stolen in interstate commerce, with knowledge that it had been stolen.

■ The court charged the jury that "to receive means to accept, and to possess means to have actual control, * * * and not a passing control, fleeting and shadowy in its nature." No objection is found with this charge by any of the parties to this case. It has been said that "both in common speech and in legal terminology, there is no word more ambiguous in its meaning than possession. It is interchangeably used to describe actual possession and constructive possession which often so shade into one another that it is difficult to say where one ends and the other begins. * * * Custody may be in the servant and possession in the master; or title and right of control may be in one and the property within the protection of the house of another * * *. So that, as pointed out by Pollock and Wright in their work on the subject, controversies arising out of mixed possession have inevitably led to many subtle refinements in order * * * to lay the proper charge of ownership in prosecutions for larceny of goods belonging to one, in the custody of another * * *." National Safe Deposit Co. v. Stead, 232 U.S. 58, 67, 34 S.Ct. 209, 212, 58 L.Ed. 504. One who takes possession of property, brings it within the sphere of his will; and rights of ownership "are substantially the same as those incident to possession. * * * The owner is allowed to exclude all and is accountable to no one. The possessor is allowed to exclude all but one and is accountable to no one but him." Holmes Common Law, pp. 207, 246. Possession in fact is such actual, exclusive control as the nature of the thing admits. A servant in charge of his master's goods has not possession in law. Pollock, Genius of the Common Law, p. 120. Possession involves power of control and intent to control. United States v. Curzio, 3 Cir., 170 F.2d 354. As stated by Justice Minton, when he was a member of the Court of Appeals of the Seventh Circuit: "To 'possess' means to have actual control, care and management of, and not a passing control, fleeting and shadowy in its nature." United States v. Wainer, 7 Cir., 170 F.2d 603, 606. And in holding that there was not sufficient evidence to sustain a conviction of one who was accused of having in his truck possession of butter, stolen in interstate commerce, with knowledge that it had been

stolen, Justice Minton, in United States v. O'Brien et al., 174 F.2d 341, 345, said: "He was never seen about the truck exercising any control, dominion, or authority over it, either before or after the stolen butter was found in it. There may be a suspicion that O'Brien and Keating had the same interest in this truck for the occasion and in the stolen butter that was found in the truck, but it is only a suspicion and not enough to send O'Brien to the penitentiary. United States v. Wainer, 7 Cir., 170 F.2d 603. If Keating is guilty, the most that can be said of O'Brien is that he was associating with a guilty man."

In this case there is no evidence that Tinsley or Maxwell ever accepted, or had possession of, the hijacked truck or its cargo of liquor. No inference could be reasonably drawn from the evidence that these two men had any interest in the stolen liquor, or ever exercised, sought to exercise, or pretended to exercise, any control, dominion, or authority over it. There is no evidence upon which the jury could find beyond a reasonable doubt that Tinsley was anything more than a guard and driver, paid by the week, and that Maxwell was anything but a truck driver and laborer, paid by the day. The evidence on the part of the appellants, as well as on the part of the government witnesses, shows that Pearson was the man who made the purchases, gave orders to Tinsley and Maxwell in the transaction involving the truck and cargo in question, as well as in the many other liquor transactions disclosed by the record. He told them when to report for work, where to go, where to drive the trucks—all under his immediate supervision, carried on from the driver's seat in the car that always preceded or followed the cargoes to the points designated by him. From the record before us, the conclusion is inescapable that Pearson was the only person who exercised any control, dominion, or authority over the liquor in question, from the time it was received at Paducah to the time he thereafter sold, or claimed to have sold it. The record is devoid of any evidence to indicate remotely the slightest degree of ownership of, or control, dominion, or exercise of authority over the liquor cargo in question on the part of Tinsley and Maxwell; and without such evidence, there is nothing upon which to base a finding that Tinsley and Maxwell ever accepted, or were in possession of, the liquor. Nor was there any evidence of joint possession on the part of Pearson, Tinsley, and Maxwell. A truck driver such as Maxwell, paid the wages of a day laborer, driving a truck under the direction and immediate supervision and order of Pearson, the party in possession who exercised complete dominion over the truck and contents, could not be said to have joint possession with Pearson, simply because he sat in the truck, and, under Pearson's eye, carried out his orders; and the same is to be said of the guard Tinsley. What charge against Tinsley and Maxwell, might have been substantiated by the evidence, seems, because of the nature of the case, to merit brief discussion hereafter. It is to be said that Tinsley and Maxwell were not charged with conspiracy in respect of possessing or concealing the stolen property; and it might well be that the government considered that there was insufficient evidence to sustain such charges, if they ever had been contemplated. See United States v. Sherman et al., 2 Cir., 171 F.2d 619.

■ Pearson was convicted because the jury found guilty knowledge on his part; but this was only because a jury, under certain circumstances, has the right to draw inferences of guilty knowledge where one has possession of stolen property shortly after it has been stolen, and the explanation given concerning such possession does not satisfy the jury of the innocence of the possessor. But the jury can not draw such inferences of guilty possession on the part of one who has never had possession. The evidence does not sustain the convictions of Tinsley and Maxwell on the charge of accepting and possessing stolen property with knowledge that it had been stolen.

■ There remains the question whether Tinsley and Maxwell could have been convicted as aiders and abettors; and this presents a problem that has been the source of difficulty in the case. The government has not contended that they were aid-

ers and abettors of Pearson in his guilty possession, but, rather, that they were themselves in possession of the stolen property with guilty knowledge; and, as above remarked, the evidence does not sustain this accusation. They were not charged in the indictment as aiders and abettors, but this is not necessary. For aiders and abettors may be charged directly as principals in the indictment. But to sustain their convictions, they must be proved guilty either of possession of the stolen property with guilty knowledge, or of aiding and abetting in such possession. Since they were not guilty of such possession, could they, under the government's theory and the court's charge, be found guilty of aiding and abetting? To state the general rule, it is well settled that the theory upon which the case was tried in the court below must be strictly adhered to on appeal or review; and in order to determine the theory of a case as presented to the trial court, the appellate court will look to the entire record and the briefs of counsel, and will construe the pleadings on the theory most clearly outlined by the facts stated and according to their general scope and tenor. 3 Am.Jr. 35, 38.

The theory of the government was that Tinsley and Maxwell were guilty of the actual possession of recently stolen property, with knowledge that it had been stolen. In its brief, the government contended that "within approximately one hour after the hijacking occurred, appellants Pearson, Tinsley and Maxwell came into possession of the hijacked Mueller truck and cargo of whiskey in Paducah, Kentucky." The government further argued in its brief: "So, in the instant case, it was entirely proper for the jury to infer from the possession by the appellants of recently stolen property that each of the appellants knew the property was stolen, there being a failure on the part of the appellants to explain satisfactorily such possession." However, there were no inferences to be drawn that Tinsley and Maxwell knew that the property had been stolen, merely because they assisted Pearson in its transportation.

 The trial court's instructions were in keeping with the government's claim, and it charged the jury that it was the theory of the government that the defendants were guilty of receiving and having in their possession stolen property with knowledge that it had been stolen—that it "was received and possessed with knowledge on the part of the defendants that the same had been procured in an unlawful manner;" that the "gist of the offense is the actual state of a defendant's mind when *he received the property and possessed the same;*" that, before the jury was warranted in bringing in a verdict of guilty against the defendants, it must find, beyond a reasonable doubt, "considering the case against each defendant separately, that there was knowledge that the whiskey in question was unlawfully taken *when it was received and possessed by a defendant, or defendants herein.*" The nature and burden of proof are quite different in a case where the accused is sought to be held for the crime of possessing stolen property with knowledge that it has been stolen, and where he is sought to be held as aiding and abetting the possession of stolen property by another with knowledge that the property has been stolen. In the case where he is charged with such possession with guilty knowledge, the mere possession of the recently stolen property gives rise to inferences of guilty knowledge—some courts term it a presumption of guilty knowledge—unless he gives a satisfactory explanation of such possession consistent with his innocence. Once the possession of the recently stolen property is proved, the burden is upon the accused to proceed with an explanation to show his innocence. But in a case where he is charged with aiding and abetting, the mere fact of aiding and abetting in the possession of the property does not give rise to inferences of guilty knowledge, or knowingly assisting in another's receiving and possessing stolen property. No such inferences of guilty knowledge are to be drawn against one charged with aiding and abetting as are to be drawn against one in actual possession of the recently stolen property. There is no burden immediately thrust upon one charged with aiding and abetting to give an explanation consistent with innocence such

as is placed upon one who was found in possession of the stolen property.

One who, with knowledge of the commission of a crime, assists in its execution, may not escape the penalty merely because another is the dominating or controlling actor in effectuating the criminal purpose. In such a case, the one who assists would be liable as an aider and abettor. But, in this case, Tinsley and Maxwell were not tried upon the theory that they were aiders and abettors; the case was not submitted by the district court to the jury on that theory; and the jury did not convict them on that theory. To hold them as aiders and abettors would require a new trial.

Upon the record before us, we are of the opinion that the trial court should have instructed the jury that the guilt of Tinsley and Maxwell depended upon whether, beyond a reasonable doubt, they had aided and abetted Pearson in his commission of the crime, with knowledge of the stolen character of the whiskey, and that in default of such instruction, the case as to them must be remanded for retrial.

An observation should here be made in order to guard against recurrence of a certain incident on a new trial. After Maxwell had been arrested, government agents went to the home of his father, a farmer, and there secured, among other property, some small bottles of whiskey which Maxwell had given him, as well as a rifle owned by Maxwell. On the trial, the rifle was introduced in evidence by government counsel, as he stated, "for whatever it was worth," over the strenuous objections of appellant's counsel. It remained in evidence before the jury for four days, until the conclusion of the government's case, when government counsel asked to have it excluded to avoid possible error. Under the authority of Brubaker v. United States, 6 Cir., 183 F.2d 894, the introduction of the rifle in evidence in this case constituted prejudicial reversible error; and this was not cured by its later withdrawal.

It is claimed by Tinsley that the admission of certain evidence, consisting of a pair of white cotton gloves, and the testimony of a government expert on paint, constituted reversible error. It was contended by the government that the evidence showed that Tinsley had painted out the name of Mueller & Co. on the hijacked truck in order to conceal its identity. It was proved that the paint used was of the same kind and color—a common color in general use—as that found on the cotton gloves which were discovered in the car that had been used by Pearson and Tinsley on the night the truck in question was driven to Risco, Missouri; and Elbert Smith, the negro worker who rode with Maxwell in the truck that night, testified, in answer to the question of the district attorney, that when the truck arrived at the ditch-dump road, Tinsley got in and drove it up that road where it was left. In answer to a further question as to whether Tinsley had any gloves on, Smith answered:

"Well, I am confident mighty near he did.

"Q. You are confident mighty near he did? A. Yes, sir. Because when he got out, I paid attention to a white hand, I think, you know.

"Q. When he got out, you think you did what? A. When he got out, I think he did, yes, sir.

"Q. Had gloves on? A. Yes, sir.

"Q. What kind of gloves, dress gloves, leather gloves, cotton gloves? A. I think it was cotton gloves."

Smith had been picked up by the agents of the Federal Bureau of Investigation and held for questioning one night from around 5:00 P.M. to midnight, and on another occasion, from 7:00 A.M., all day long. He stated there was a "heap" of agents at the office; that they told him what had happened, where he was, and what he did; and that they knew as much about it as he did. One of the agents stated that he was familiar with the natural reaction of a negro at the approach of a law officer, and that it tended to make him a little scared. The car in which the gloves were found was, as has been said, Senter's car, and after its use that night by Pearson, it was returned to Senter, in whose posses-

sion it remained for more than a month before the agents found the gloves. Senter said he and his brother were the only persons that used it during that time. Senter's brother did not testify. It is claimed that Elbert Smith's testimony that he was "confident mighty near he did" because "I paid attention to a white hand, I think," was, under the circumstances, prejudicial and should have been excluded, inasmuch as it did not constitute any evidence that Tinsley wore gloves that night; that they were the same gloves that were found in the car a month later; and that they were used by Tinsley in painting out the name on the truck. It must be admitted that this evidence, as proof of Tinsley's complicity, is rather thin and not more than loosely connected up; but, in our view, whatever weight was to be given it was, under all of the circumstances, for the jury.

How cautious one should be to guard against accepting suspicion as proof is seen, in this case, with respect to Senter. When the officials of the Federal Bureau of Investigation went to the hotel in Cairo to check as to whether Senter had, as he claimed, registered there on the midnight before the hijacking, several agents failed to find his name among those registered. It was only after considerable investigation that it was discovered, as a result of a continued and repeated search through the files, by one of the counsel for appellants, that the name of Daniel Reese Senter had been filed under the letter "L" as "D. R. Lente" because of the peculiarity of Senter's handwriting. If this registration had not been discovered, Senter might now find himself under a sentence of ten years for a crime he did not commit. For in such case, the evidence against him would have been formidable—an associate of Pearson, and an ostensible partner in his business; the driver of the car which he admitted he drove to Vienna—where Helm's truck was parked—on the night before the hijacking; and the owner of the car in which the paint-stained gloves were found. Moreover, without proof of his registration at the hotel, it would have been impossible for him to account for most of his time during the night of December 30 and the morning of December 31—especially at the very hour of the hijacking. It may well have been the finding of the hotel registration card that had been, at first, improperly filed, that is responsible for Senter's being a free man today.

We finally come to the appeal of Horace Twitty, who, like the others, was convicted of the offense of possessing stolen property with knowledge that it had been stolen. The facts with regard to Twitty are as follows:

Twitty had first worked as a truck driver for Pearson many years before the incident here in question, at a time when Pearson and his brothers conducted a wholesale whiskey business in Oakville, Tennessee; and subsequently, he continued at various times to work for him in Tennessee and Mississippi. In 1948, he went into business for himself, in Mississippi, and later, in July 1949, went to Oklahoma. Thereafter, he resumed his employment with Pearson until about December 1, 1949, when he again went into business for himself. Around December 23, it appears from the testimony of a government witness, Cecil Combs, that Twitty and Combs were carrying on a liquor business as partners or joint venturers. The night before the hijacking, on December 30, 1949, Twitty, according to his own testimony and that of Combs, was in Hot Springs, Arkansas, and on the morning of the hijacking, was still in Hot Springs with Combs. During that day, December 31, he drove with Combs through Arkansas and Mississippi, attempting unsuccessfully to purchase whiskey from various places for purposes of resale, and at the end of that day, arrived at Memphis about ten o'clock in the evening. Twitty had nothing to do with the hijacking or the transportation of the stolen liquor from Paducah to Memphis, or the driving of the stolen truck into Missouri; and there is no evidence to indicate that he knew anything whatever about it.

On the afternoon of January 1, 1950, Twitty went to see Pearson at the latter's home in Memphis, told him of his predicament—that he and Combs had been unsuccessful in purchasing any liquor—and asked Pearson if he knew where he could secure

any whiskey at that time. Pearson, according to Twitty, then told him that he had some whiskey for sale, and showed Twitty a list of brands, whereupon Twitty said that he could use the whiskey on the following Tuesday. Shortly after his talk with Pearson, Twitty called his partner, Combs, who was, at that time, at Cairo, and told him that they had "made contact to get some whiskey." It is important to note that there is no question that when Twitty was negotiating with Pearson about purchasing the liquor, Twitty and Combs were partners, and that, according to Combs, Twitty was securing the whiskey from Pearson for their joint account. On Tuesday morning, as agreed, according to Twitty, Pearson told him that he could get the liquor in question at the Harris farm; and Twitty went there with a truck owned by Combs and secured a load. Later, on January 11, he secured an additional load; and on January 23, he secured a final lot of liquor from the Harris farm.

It is unnecessary to discuss all the evidence bearing upon Twitty's claim of innocence, or the government's charge of his complicity in the commission of the offense for which he was tried. It is sufficient to say that, in view of Twitty's possession of the recently stolen property, it was for the jury to determine whether the explanation given by him was reasonable, satisfactory, and, under all of the circumstances which were disclosed, consistent with his innocence. In taking into consideration Twitty's explanation, and in the light of the surrounding facts and circumstances, it is our conclusion that the evidence, although circumstantial, was sufficient to warrant the jury in drawing the inference that Twitty knew that the liquor had been stolen.

Nevertheless, it is our view that the judgment as to Twitty must be reversed, and the case, as to him, remanded for a new trial, for the following reason:

When Twitty was being cross-examined by government counsel, he was asked:

"Q. Now, you were also convicted in 1934 of receiving stolen property here in Tennessee, and given a 30 day jail sentence, weren't you? A. That indictment was dismissed.

"Q. You didn't get a 30 day sentence? A. No, sir."

In his re-examination, Twitty's counsel attempted to ascertain the circumstances surrounding the situation that prompted government counsel to inquire as to this conviction for having received stolen property, and Twitty was asked:

"Q. Now, Mr. Twitty, there is a reference has been made here about a conviction in 1934 and you getting 30 days here. What was that reference, Mr. Farnsworth (government counsel)?

"Mr. Farnsworth: I will read them all back to you.

"Mr. Gwinn (Counsel for Twitty): Just wanted that receiving stolen property.

"Mr. Farnsworth: The one I asked him about, which he denied, occurred in 1934, shows Twitty served 30 days, receiving stolen property.

"Mr. Gwinn: And he denied that?

"Mr. Farnsworth: He denied that. Said that was set aside or something."

At the time government counsel asked Twitty the questions concerning a prior conviction, apparently Twitty's counsel had no knowledge of such a conviction or of any of the circumstances giving rise to such a question. Later, in his motion for a new trial, Twitty's counsel set forth that Twitty had not received any sentence for the offense of receiving stolen property; that, although he had been arrested, the assistant attorney general had filed a statement with the criminal court of Shelby County, Tennessee, setting forth that it was useless even to present the case to a grand jury, inasmuch as there was no evidence to justify such action. This recommendation to dismiss the warrant was acted upon by the court, which immediately dismissed the warrant upon the statement of the attorney general.

When, on his trial, Twitty was asked by government counsel whether he had not been convicted of the charge of receiving stolen property, and given a thirty-day sentence, counsel either knew, or by the slight-

est inquiry could have learned, that Twitty had never been convicted of such charge, and that the warrant had been dismissed, as above set forth. Anyone who examined the records of the case—and they were right there in Memphis where the case was being tried—would have seen at once the statement which had been filed by the assistant attorney general. Counsel may have proceeded under the assumption that such a question was proper, but if so, he was in error. Whatever the explanation may be for asking the question, the result was that Twitty was gravely prejudiced before the jury by such action.

While, as we have said, the evidence disclosed that Twitty, admittedly, had possession of stolen property—which he claimed was without guilty knowledge on his part—and the question whether his explanation, consistent with his innocence, was reasonable, was for the jury, nevertheless, his defense rested on more solid ground than that of Pearson. For Pearson had, as far as appears from the evidence, received the property directly from one of the hijackers, while Twitty, admittedly, had been trying to purchase liquor, in company with his partner, Combs, the government witness, for some days before the liquor in question was stolen, finally securing it from Pearson. The farther removed the receipt of property is from the actual theft, or the original receiver, the weaker is the chain of circumstantial evidence from which guilty knowledge can be inferred.

We are mindful that when, later, Twitty and Combs were transporting the liquor through Arkansas, in violation of the laws of that state, and suddenly discovered that they were being followed by a car that they suspected might be a police car, Twitty, during a period of forty-five minutes of waiting and observation of the other car, in talking the matter over with Combs with the idea of avoiding possible arrest, mentioned that if the liquor was "hot," meaning stolen, they would never get out of jail in that state; and they afterward abandoned the truck and evaded the men in the car following them, who actually turned out to be state police officers. While Twitty's remark was properly considered by the jury, as bearing upon his possible guilt, it was not, in itself conclusive that he knew that the liquor was actually stolen. It might have been one of the factors that would be considered by bootleggers, if they had, as in this case, a considerable period in which to decide whether they would risk arrest and take a chance of getting away with the liquor which they suspected was under observation by police officers, or abandon it and escape arrest.

At the time that Twitty was asked whether he had been previously convicted, in 1934, of being a receiver of stolen property, and served a sentence therefor, it is to be remarked that his counsel could not have objected to the question, inasmuch as it would have been an entirely legitimate inquiry, if Twitty had actually been convicted; and his counsel could not have prevented the introduction into evidence of the court record of such conviction, since this is the proper mode of interrogation of a defendant who has been previously convicted and the method of proof in case of such defendant's denial.

The case against Twitty was not as strong as the one against Pearson. The government failed in its efforts to convict three other defendants, who were jointly charged with Twitty. As to one of them, the court granted a motion of acquittal; as to two others, the jury brought in verdicts of not guilty, although one of the defendants had stored the entire cargo of liquor on his premises, and kept the key to the place of storage, allowing the liquor to be withdrawn from time to time on order of Pearson; and the other had transported the liquor under, what the government claimed, were circumstances clearly indicating his guilt beyond a reasonable doubt. Twitty's chances for a verdict of not guilty of the charge of receiving stolen property could have well depended on whether the jury thought he had been convicted, or learned he had been arrested, as a receiver of stolen property on a prior occasion.

What was the purpose of the question which was asked Twitty? What was the explanation given by government counsel? None. Yet government counsel must have inspected the record in the state court,

or the question would not have been asked; for he knew the year—sixteen years before—and he knew of the offense for which Twitty had been arrested; and this could only be known by someone who had knowledge of that case. Nevertheless, after Twitty's denial, the question was left on the record, with the statement of government counsel, that "The one (conviction) I asked him about * * * shows Twitty served 30 days, receiving stolen property." It did not show that—neither a conviction nor sentence; and when the inquiry was made of government counsel by Twitty's lawyer, whether appellant had denied the charge, the reply of the district attorney that Twitty "Said that was set aside or something" could well indicate that government counsel took no stock in such denial.

 The action of government counsel in asking Twitty whether he had not been previously convicted of receiving stolen property on a stated date, when he had not been so convicted, and when there was no basis for such an inquiry, was prejudicial to the right of the defendant to a fair trial. For it naturally required Twitty to admit the arrest in question and explain it; and it is held to be prejudicial and reversible error even to permit a prosecutor to ask a defendant in a criminal case whether he has been arrested for an offense. Mitrovich v. United States, 9 Cir., 15 F.2d 163. "It is competent for the purpose of discrediting a witness to show that he has been convicted of a crime. The general rule is that the crime must rise to the dignity of a felony or petit larceny. * * * Whatever may be the limit in this respect, nothing short of a conviction of a crime is admissible for the purpose of impeachment. A mere accusation or indictment will not be admitted, for the reason that innocent men are often arrested charged with a criminal offense." Glover v. United States, 8 Cir., 147 F. 426, 429; Westwater v. Lyons, 3 Cir., 193 F. 817; Pittman v. United States, 8 Cir., 42 F.2d 793; Simon v. United States, 4 Cir., 123 F.2d 80. It must be held that Twitty was prejudiced by the question asked by the government counsel, for it is quite conceivable that the evidence thus elicited affected the jury's verdict.

Verro v. United States, 3 Cir., 95 F.2d 504. Since he was being tried before a jury on the charge of receiving stolen property with guilty knowledge, the groundless suggestion that he had theretofore been convicted on a similar charge, vitiates Twitty's conviction and calls for a new trial.

Other contentions presented on appeal we find are not meritorious, or are unnecessary to decision.

In accordance with the foregoing, the judgment as to appellant Pearson is affirmed; the judgment and convictions of appellants Tinsley, Maxwell, and Twitty are reversed and the case, as to them, is remanded to the district court for a new trial.

SIMONS, Circuit Judge (concurring). I concur in the result.