361 F.2d 365
 UNITED STATES of America
v.
Thomas Richard CHIBBARO and Joseph Franklin Scarbrough.
Thomas Richard Chibbaro, Appellant.
UNITED STATES of America
v.
Thomas Richard CHIBBARO and Joseph Franklin Scarbrough.
Joseph Franklin Scarbrough, Appellant.
 Nos. 14947, 15025.
 United States Court of Appeals Third Circuit.
 Argued Sept. 13, 1965.
Decided May 26, 1966, As Amended June 14, 1966.
 
 Daniel E. Isles, Orange, N.J., for appellant Joseph Franklin scarbrough.
 Matthew J. Ryan, III, Philadelphia, Pa., for appellant Thomas Richard Chibbaro.
 Richard A. Levin, Asst. U.S. Atty., Newark, N.J. (David M. Satz, Jr., U.S. Atty., Newark, N.J., Oliver Lofton, Asst. U.S. Atty., on the brief), for the United States.
 Before BIGGS, Chief Judge, and KALODNER and SMITH, Circuit Judges.
 OPINION OF THE COURT
 BIGGS, Chief Judge.
 
 I. FACTS
 
 1
 An indictment in two counts was returned against the defendants-appellants, Scarbrough[1] and Chibbaro, charging them with violations of 18 U.S.C., Sections 2113(a) and 2113(d), in that they robbed the Citizens First National Bank of Ridgewood, Waldwick Branch, Waldwick, New Jersey, and put the lives of the employees of the bank in jeopardy while doing so. Both defendants were convicted on both counts of the indictment, were sentenced to terms of imprisonment and have appealed.
 
 
 2
 On August 19, 1963,[2] at about 6:15 A.M. the bank custodian, Cruz, entered the bank and was accosted by two men, armed with firearms, and later identified as Scarbrough and Chibbaro, who apparently were waiting inside the bank. As six other employees entered the bank that morning they with Cruz were herded into a lavatory and later taken to the basement where they were handcuffed. The two armed men compelling one of the employees, the assistant manager, Smith, to open the vault, robbed the bank of some $83,000 in cash and travellers' checks. The robbers made good their escape in an automobile believed to be an Oldsmobile parked in a lot near the branch bank with or near a tan station wagon.
 
 
 3
 The description of what occurred on August 19 varied from witness to witness. It appears, however, that the robbers wore ladies' dark stockings as hoods, described as 'stocking masks', and rubber gloves and carried a white bag similar to a pillow case in which the fruits of the robbery were placed. One robber was described as rather a 'husky' man and the other as rather a 'slim' individual. It was testified that the latter talked 'incessantly' during the robbery. There is evidence that the robbers also wore hats.
 
 
 4
 After the robbery an Oldsmobile[3] was discovered and was found to contain several thousan dollars, some money wrappers and some American Express Company travellers' checks, the last items being identified as having been taken from the branch bank. Many other articles were found in the Oldsmobile, including a 'standard' type laundry bag, a glove and a hat which were only identified as items similar to those used or worn by the robbers.
 
 
 5
 A special agent of the Federal Bureau of Investigation arrived at the branch bank at about 9:15 A.M., approximately an hour after the robbers had fled. There was difficulty in identifying the robbers because of their stocking masks. Special agents of the FBI took statements from all of the bank employees who were present at the robbery and at various times submitted to all of them many photographs of various individuals, some sixty pictures or more, hoping to establish the identity of the robbers. Seemingly no positive identification was possible but apparently six of the sixty photographs, or perhaps six other photographs,[4] were submitted at various times[5] to the employees of the branch bank who were present during the robbery. Some of the employees testified that Scarbrough and Chibbaro looked like the men in two photographs which were among the six. The date on which the six photographs were shown to some of the bank employees was September 27, 1963.
 
 
 6
 Earnest and vigorous efforts were made by the FBI to effect identification of the robbers. On September 12, 1963, some of the employees of the branch bank who were present during the robbery were taken to a Hudson County, New Jersey, Court where they viewed Scarbrough.[6] Most of the witnesses could not identify Scarbrough positively from this limited viewing.[7]
 
 
 7
 Special Agent Charles F. Crowley of the FBI testified that he called Scarbrough to the FBI office in Newark on October 18, 1963, for an interview. At the same time some of the employees of the bank who were present during the robbery were taken to the FBI office, where looking through a 'one-way mirror',[8] they observed Scarbrough in an adjacent room. On November 18, 1963, this same procedure was followed in an attempt to identify Chibbaro. As a result of the 'one-way mirror' observation some of the bank employees identified the two appellants with some degree of certainty both by appearance and voice.
 
 
 8
 At the October 18 'once-way mirror' observation of Scarbrough he was questioned by FBI agents but the bank robbery was not discussed. Scarbrough was again called to FBI headquarters for another interview on November 19 and questioned about the instant robbery. However, his actual status at this interview is cloudy. The court inquired of Agent Crowley as to whether or not at that time Scarbrough was under arrest on the charge of robbing the bank. Agent Crowley replied: 'I can't say-- Well, he had been identified the day previous.' The agent was then asked: 'Did you notify him that he was to be detained on the charge of the robbery of this bank?' Agent Crowley answered: 'I notified him that a detainer would be placed against him for his participation in this bank robbery.' The court asked if the detainer had been placed. The agent replied that he did not know whether the detainer had or had not been placed against Scarbrough 'at that moment'. Scarbrough had previously testified that he was arrested on November 19, 1963. We will discuss the issues presented by these circumstances at a later point in this opinion.
 
 
 9
 Chibbaro exercised his right not to take the stand at the trial. Scarbrough testified on his own behalf, stating on direct examination that he did stevedoring work and attended 'shape-ups' at the 'C-O-Two' plant in Hoboken, as his means of livelihood.
 
 
 10
 Agent Crowley, over vehement objection, testified for the United States on rebuttal. He stated that when he interviewed Scarbrough on October 18 and asked Scarbrough what was his occupation, the appellant answered: 'Let's not kid each other. You know who I am and what I do. I'm a hold-up man.'[9] Agent Crowley also testified that when he saw Scarbrough on October 18 there was a scar on his left cheek.[10] Scarbrough's counsel objected to this testimony as not being proper on rebuttal and moved that the testimony be stricken from the record and for a mistrial. These motions were denied. It should be noted that the Assistant United States Attorney on cross examination of Scarbrough, he having testified previously respecting his interview with the FBI on October 18, had asked him: 'Pursuant to a question concerning your employment, did you say, 'Let's don't kid each other. You know who I am and what I do.' Then he explained that he was a holdup man. Did you say that to the FBI that day?' Scarbrough answered: 'I never said nothing like that.'[11] Again there was a motion for a mistrial which was denied. Both Scarbrough and Chibbaro were identified at their trial in the court below by employees of the bank, though some of these identifications were shaken by contradictions in testimony brought out by strong cross-examination. Evidence was given by certain bank employees respecting a scar or blemish on Scarbrough's face.[12] It seems clear from the record that at his trial Scarbrough's face was clear of any scar or facial blemish. Scarbrough, as we have stated, testified on his own behalf. The Assistant United States Attorney asked him whether on October 18, 1963 he had told the FBI that he had 'a small scar on the left cheek'. Scarbrough denied having made this statement. At this point his counsel interjected the comment that the question 'flouts all common sense'. The trial judge then said from the bench, 'Scars can be mended.' There was again a motion for a mistrial on the ground that the judge's comment was unfair and prejudicial.[13] It should be noted also that Agent Crowley on rebuttal never testified that Scarbrough had made a statement concerning the alleged scar. Crowley could only remember asking Scarbrough if 'he had any scars or marks.' Crowlely then stated that he recorded a scar on Scarbrough's left cheek. But Crowley could not recall whether Scarbrough had said he had such a scar.[14]
 
 
 11
 The Assistant United States Attorney also asked Scarbrough on cross-examination whether he made a statement to the FBI on November 19 that even though he had knowledge concerning the Waldwick bank robbery he would never reveal this information. Scarbrough stated, 'That's a lie.'[15] Agent Crowley testified, again over objection, that Scarbrough first denied knowledge of this robbery, 'but he later stated that he had knowledge but he would not divulge it to the interviewing agents nor would he furnish any information to them involving anyone else who participated with him in any action of that sort.'[16] At another point the court also stated that Scarbrough was a witness 'hostile' to the prosecution.[17] Scarbrough's counsel again moved for a mistrial which was denied,
 
 
 12
 We deem it necessary to set out two other areas of the evidence. The first concerns the relationship of the Oldsmobile and its contents to the appellants. The second concerns the testimony of Charles M. Clobridge.
 
 
 13
 Turning to the first area, Mrs. Irene Suter, who lived near the branch bank, testified that she looked out of the window of her house at about 7:50 A.M. on the morning of the robbery and saw 'a dark gray and white Oldsmobile drive up', that from three to five minutes later she saw 'a tan station wagon drove up behind it', and that she saw a man get out of the Oldsmobile and into the station wagon. She identified that man as Scarbrough. She testified that the license plate on the Oldsmobile was either 'EV713' or 'EV 1713' and that the automobile was only from twenty to thirty feet away from her. This automobile was identified subsequently as the one which contained some of the proceeds of the robbery. Mrs. Suter's descriptions of the Oldsmobile and of Scarbrough were not accurate but it is clear that she called the police between 1:00 and 1:30 P.M. on the day of the robbery, calling their attention to the Oldsmobile which was still parked apparently in the same position where she had first seen it.
 
 
 14
 Jaegge, a packaging engineer employed by 'General Precision Aerospace', thestified that on the morning of the robbery he had gone to the Waldwick railroad station to take the 7:56 A.M. train to Paterson. He saw two men, one carrying a brief case or a suit case, get upon the same train that he boarded. Jaegge also was taken by an FBI agent to the Hudson County courthouse at Jersey City to view Scarbrough but was unable to make any adequate identification of him on that occasion. Jaegge testified, however, at the trial in the court below that though he could identify Scarbrough as having been at the trial in the Hudson County courthouse he could not make a 'positive identification' of him. He made no identification of Chibbaro. His witness also had been shown photographs by an FBI agent but was unable to make any sufficient identification form them.[18] Upon motion of Scarbrough's counsel the trial court ordered Jaegge's entire testimony stricken from the record. The court did not, however, direct the jury to disregard his testimony nor did Scarbrough's counsel make such a request that he do so.[19]
 
 
 15
 Miss Linda Karsk was also called by the United States. She testified that she knew Scarbrough and that he had an automobile: 'An Oldsmobile, I guess.' She stated that Scarbrough had asked her to sign an application for licensing the car as a favor, and that 'They (Scarbrough and his wife) had had an accident and he asked me to sign the car in my name for a favor.' Miss Karsk was a nervous and reluctant witness. Her evidence was of little, of any, probative value and the court ordered it stricken from the record. Again the trial judge did not direct the jury to disregard this testimony, but neither counsel for the appellants made any motion that the jury be so instructed.
 
 
 16
 FBI Agent Linker testified that the automobile had the license number 'EVI 713' and that in it were a large number of articles including a 'standard' laundry bag, a gray work glove, $4,725 in United States currency, $1,820 in American Express Travellers checks, some money wrappers and a balck hat. The American Express Travellers checks were identified as having been part of the loot of the robbery. There were also a number of other articles which apparently had no connection with the crime such as a bottle of aspirin, a good-luck charm, and other unimportant items such as some paper bags. The owner of the car appears to have been a 'Mr. Weed', otherwise unidentified. Certain articles, those which seemed relevant to the robbery, were retained by FBI agents and offered and received in evidence. The other articles were returned to Weed. On cross-examination of Agent Linker by Scarbrough's counsel it appealed that Weed allowed the articles not returned to him to be retained by the FBI. In a sense, therefore, the jury could draw the inference that the articles which were in the car and not returned to Weed had been put there by the robbers, including the laundry bag and assuredly the travellers checks. Because of these facts which seem undisputed, Scarbrough contends that Weed was permitted to testify in absentia because, of course, he was not available for cross-examination.
 
 
 17
 During the course of the cross-examination the trial judge asked Agent Linker: 'Were you with him (Weed)?' The witness replied: 'Yes, I was.' The agent went on to say: 'Mr. Weed was afforded the opportunity of viewing every one of the items set forth on that 302,[20] and after a review Mr. Weed set forth, and Mr. Brown (Scarbrough's counsel) just read it, the items which he maintained were not in his vehicle at the time it was stolen.' Scarbrough's counsel then asked that 'that be stricken as hearsay', saying that he could not cross-examine Weed as to whether the items referred to in the agent's testimony were there, in the automobile or not. Counsel for Scarbrough concluded by stating, 'It is not even responsive to your question.' The trial judge replied, 'No, it is responsive to my question and I won't strike it. You may have an exception.'
 
 
 18
 The final area of evidence necessary for the decision is the testimony of Charles M. Clobridge, which was most damaging to Chibbaro. Clobridge had been convicted three times for the commission of felonies, had spent twenty years in prison, and at the time of which we speak had been indicted by a grand jury of the United States District Court for the Eastern District of New York for extortion and was awaiting trial for the offense. He stated that he was in the Hudson County jail in November 1963 and had had several conversations with Chibbaro during which Chibbaro told him of his participation in the robbery of the branch bank, giving him details of the commission of the crime. Clobridge stated that he had told his counsel in the Brooklyn case, an attorney employed by a legal aid society, of Chibbaro's statements and that his attorney had informed the United States Attorney of the District of New Jersey of the availability of this information. The FBI then procured a statement from Clobridge.[21] Upon cross-examination Clobridge stated that he had decided to become a witness for the United States for the prosecution of Chibbaro because he hoped for 'some consideration' from the sentencing judge in the United States District Court for the Eastern District of New York, but he denied that any reward or promise or deal had been made or proferred to him by the prosecution in exchange for his testimony.[22]
 
 
 19
 Before Clobridge was permitted to testify the court below told the jury that if there was any testimony given to them as to any admissions made by Chibbaro to Clobridge, such admissions would be admissible and valid only as to Chibbaro. The trial judge also said: 'If there were a way of precluding any mention of anybody but * * * (Chibbaro) I would try to do it * * *.' The strategem of mentioning a 'No. 2 man' in lieu of naming Scarbrough was employed when Clobridge testified respecting Chibbaro's admissions as to the robbery, Scarbrough obviously being the man involved. Clobridge gave this evidence despite almost constant objections from Scarbrough's attorney. These objections made it all the more obvious that Scarbrough was the 'No. 2 man'. In the charge to the jury the court below did not make any mention of Clobridge's testimony and of course, therefore, delivered no special cautionary charge respecting it, but there were no objections to the charge and no special instructions were requested by counsel for either defendant in respect to Clobridge's testimony. Cf. Rule 30, Fed.R.Crim.Proc., 18 U.S.C.
 
 
 20
 Following Chibbaro's trial Clobridge pleaded guilty to the Brooklyn extortion indictment and received a three year sentence. Chibbaro's brief in this court states that thereafter, on May 21, 1964, he wrote a letter to Judge Bartels of the United States District Court for the Eastern District of New York complaining about his sentence on the ground that he had not received sufficient consideration for being a witness for the United States at Chibbaro's trial.[23] After Clobridge was sentenced to a term of imprisonment he was confined at Lewisburg prison as was Chibbaro, and while he was there he wrote three separate notes or statements to Chibbaro stating in substance that he had lied in his testimony respecting Chibbaro at the trial, alleging that he, Clobridge, had been threatened by the Assistant United States attorney and the FBI.[24] This court, while retaining jurisdiction, remanded Chibbaro's appeal at our No. 14947 to the court below for the purpose of hearing and passing upon this evidence which, it was asserted, was newly discovered and was offered as a basis for a motion for a new trial by Chibbaro. On February 19, 1965, Clobridge testified at length in the court below in respect to this motion and in effect denied that he had told the truth in the statements which he had given or caused to be given to Chibbaro at Lewisburg, stating that he had written what he had because of fear of retaliation by Chibbaro. It is not entirely clear whether the court below considered Clobridge's notes to Chibbaro to constitute newly discovered evidence but it is apparent that the trial judge was of the opinion that Clobridge's original testimony given at Chibbaro's trial was more worthy of belief than his later contradictions. Consequently he denied the new trial sought by Chibbaro. While the court below did not pass specifically upon the issue as to whether or not Clobridge had been promised a sentence of 'no more than two years' in return for his testimony, the trial judge stated: 'It seems to me that it is a question of this man being under oath twice, sworn, giving sworn testimony which is inherently credible, and I shall deny your motion for a new trial.'[25]
 
 
 21
 The foregoing constitutes a resume of what we deem to constitute those portions of the record in the instant case on which our decision must turn. We turn now to a determination of the salient points of law.
 
 
 22
 II. THE LAW.
 
 
 23
 The appellants have raised numerous issues of law. We have considered all of them but we will discuss in this opinion only those points which in our view require consideration.
 
 
 24
 A. Very substantial reliance is placed by both appellants on the Sixth Amendment to the Constitution of the United States and the decision of the Supreme Court in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Both appellants were invited or requested to come to FBI headquarters in Newark. We have stated the circumstances which surrounded Scarbrough's attendance at those headquarters. The circumstances surrounding Chibbaro's appearance are not too clear but we may assume that they did not differ greatly from those attendant upon Scarbrough's first appearance, except that it is undisputed that Scarbrough stated to the FBI agents that he desired to be represented by his counsel, Mr. Brown, if he was under arrest. It appears that on the occasion of Scarbrough's appearance on November 19, 1963, he was about to be arrested. The record is very cloudy as to what actually took place while the appellants were at FBI headquarters, a cloudiness which must be cleared up on the new trial which will be required. It is clear, however, that members of the branch bank staff viewed the appellants through the 'one-way mirror', heard the appellants' voices and thereafter identified them at their trial as the robbers.
 
 
 25
 In the Massiah case, Massiah had been indicted and was free on bail. Missiah's alleged partner in crime agreed to cooperate with the police. By prearrangement with the police, a radio transmitter was installed in the partner's automobile, thereby enabling the police to hear conversations carried on in the car. The partner talked with Massiah and obtained incriminating statements from him. The Supreme Court held that the statements were inadmissible since the police practice offended Massiah's right under the Sixth Amendment to the protection of counsel. The Court treated this surreptitious questioning as an interrogation by the police and held that at this point in the proceedings, i.e. post-indictment, Massiah had the right to the assistance of counsel. In Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court extended the right of counsel to a person who had not been indicted or arraigned but who had been taken into custody and interrogated by the police at the police station. Escobedo had an attorney and had conferred with him a few days prior to his questioning at the police station. During his detention by the police Escobedo's attorney was present in the building and attempted to speak to his client but was denied access to him by the police. Escobedo also requested permission to talk to his counsel but the police denied that request. The Supreme Court stated: 'We hold, therefore, that where, as here, the investigation is no lenger a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment * * * and that no statement elicited by the police during the interrogation may, be used against him at a criminal trial.' 378 U.S. at 490-491, 84 S.Ct. at 1765. The Supreme Court also stated: 'We hold only that when the process shifts from investigatory to accusatory-- when its focus is on the accused and its purpose is to elicit a confession-- our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.' Id. at 492, 84 S.Ct. at 1766.
 
 
 26
 The visits of the appellants to FBI headquarters took place in October and November, 1963. Massiah and Escobedo were decided in 1964. In United States ex rel. Russo v. State of New Jersey and United States ex rel. Bisignano v. State of New Jersey, 351 F.2d 429 (3 Cir. 1965), we held that a request for counsel by an individual, who was in fact under arrest and subject to police interrogation, was not necessary under circumstances substantially similar to those of Escodedo.[26] We did not pass expressly upon the question of whether the principle of Escobedo should be applied retroactively in the cited cases though the Supreme Court applied the Sixth Amendment principle in Escobedo retroactively as it did also in Massiah.
 
 
 27
 A careful examination of the principles enunciated in Massiah convinces us that they are not applicable under the circumstances of the appeals at bar. What the FBI did prior to the appellants' trial was to attempt to effect identifications of them by the use of the mirror and by hearing of their voices, but it also appears that on the occasion of Scarbrough's second visit to the FBI headquarters on November 19, 1963, the agents also attempted to elicit a confession from him. The record is silent as to what was the nature of the FBI questioning of Chibbaro on that day cut we think we can assume, since the arrest of both defendants was accomplished almost immediately, that Chibbaro also was asked questions respecting the robbery. True, the method used was a subterfuge to submit the appellants to a viewing of their persons and to a hearing of their voices by the bank witnesses. But the means employed were essentially no different from that used when the bank witnesses were taken to the Hudson County Court to see Scarbrough, or would have been employed if the appellants had been put on display on a police station stage except there was no 'line-up.' It is not clear how many FBI agents were in the adjacent room with each individual appellant when he was viewed by the bank witnesses but certainly not more than two agents were present with each appellant during the viewings. In this respect the present record is also far from clear. Massiah was under arrest and free on bail when the listening device was installed and operated in his partner's car. Scarbrough was viewed by the bank witnesses on October 18 and he was also present at FBI headquarters on November 19, 1963. Chibbaro was present at FBI headquarters and was viewed on November 19, but the record is silent as to whether or not Scarbrough was viewed again on November 19. The record is also cloudy as to whether the appellants were arrested or were about to be arrested, because of the detainers when they were at FBI headquarters on November 19. It would appear that a detainer was lodged against Scarbrough at least by November 19. Is the Massiah principle applicable here?
 
 
 28
 The circumstances of this aspect of the present appeals are closer to those which attended the decision of this court in Rigney v. Hendrick, 355 F.2d 710 (1965), affirming Morris v. Crumlish, 239 F.Supp. 498 (E.D.Pa.1965), in which a jailed accused, Morris, awaiting trial in a state court was subjected to a police lineup and a viewing, in connection with a crime of which the accused had not yet been charged. Cf. United States v. Evans, 359 F.2d 776 (3 Cir. 1966). The issue presented by the Rigney case was whether Morris had been denied equal protection of the laws under the Fourteenth Amendment because he, an indigent accused, was unable to make bail. This court held that Morris had not been deprived of equal protection of the laws.[27] But the Rigney decision is not apposite here for we are faced with a fifth Amendment question. Were the appellants compelled to testify against themselves?
 
 
 29
 The United States contends that the Fifth Amendment in its prohibition against compulsory self-incrimination does not apply to pretrial efforts to indentify a suspect as the perpetrator of a crime. To extend this doctrine to the circumstances at bar, says the United States, would be 'irrational' and place a heavy obstacle in the way of identification of criminals by the police. In Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), testimony was received that the accused, prior to trial, put on a blouse which fitted him. This was some of the proof adduced at trial to demonstrate that the accused was the murderer. The defense asserted that the defendant had been coerced into this self-incriminatory action. The Supreme Court, speaking through Mr. Justice Holmes stated, id. at 252-253, 31 S.Ct. at 6, that the defense objection was 'based upon an extravagant extension of the 5th Amendment.' Mr. Justice Holmes went on to day, 'But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof.' But Mr. Justice Holmes then stated: 'Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904).' In the Adams case the Supreme Court held that an accused's papers seized upon a search warrant, which, perhaps, was invalidly executed, were nonetheless admissible in evidence against him despite the fact that he had not testified on his own behalf. The authorities draw a distinction between compelling an accused to testify against himself in a testimonial manner and compelling him to submit to what may be called for want of a more descriptive phrase, a physical examination. 8 Wigmore, On Evidence, Section 2265 (McNaughton rev. 1961), treats the latter type of evidence as relating to 'Bodily Condition'. Wigmore points out that an inspection of the 'bodily features (of an accused) by the tribunal or by witnesses does not violate the (accused's) privilege (against self-incrimination) because it does not call upon the accused as a witness-- i.e. upon his testimonial responsibility.' Wigmore points out that a great variety of illustrations have been ruled upon by the courts. Eleven principal categories are then set out: such as routine finger printing, photographing or measuring of a suspect; imprinting of other portions of a suspect's body; extraction of substance from inside the body of a suspect for purposes of analysis and use in evidence, and others. Wigmore next details four other varieties of evidence of bodily condition which it is said are 'without the privilege'. One of these is '(7) Requiring a suspect to speak for indentification.' Five cases are cited to the text at 396-97. Three are relevant. Two are not. We approach the issue at this point upon the following theory: the viewing of Chibbaro and Scarbrough by the bank witnesses was an involuntary viewing, and the hearing of their voices were in a true sense involuntary for we can certainly assume that if the appellants had known that they were being called to the FBI headquarters for the purpose of identification they would not have come there and certainly would not have spoken. The position of the appellants therefore is analogous to what it would be if while in court they had been ordered to speak so that the bank witnesses might havethe opportunity to identify their voices.
 
 
 30
 Other instances in the second grouping given by Wigmore in Section 2265 include requiring a suspect to write for identification, to appear in court, to stand, assume a stance, to walk or make a particular gesture. As appears from the cases cited in the footnotes to the Wigmore text, the authorities are very much divided even on the question as to whether a defendant can be compelled to stand in court. See United States v. Sorrentino, 78 F.Supp. 425 (M.D.Pa.1948) (requiring a defendant to stand for identification). Cf. People v. Koval, 371 Mich. 453, 124 N.W.2d 274 (1963) (requiring a blood test for intoxication without warning accused of his rights), but the decision of the Supreme Court in Holt v. United States, supra, indicates, we think, that compelling an accused to disclose his 'bodily condition', in effect compelling him to submit to a physical examination to disclose physical characteristics for identification, would not constitute self-incrimination prohibited by the Fifth Amendment. Compare Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) with Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). But with the exception of two of the cases referred to previously in Wigmore's note 9 cited to Section 2265, we can find no decisions directly in point. See, however, Johnson v. Commonwealth, 115 Pa. 369, 9 A. 78 (1887), and Griswold, The Fifth Amendment Today, 39 Marq.L.Rev. 179 (1955). Cf. Helton v. United States, 221 F.2d 338, 341-342 (5 Cir.1955) and Smith v. United States, 119 U.S.App.D.C. 272, 340 F.2d 797 (1964).
 
 
 31
 It can be argued plausibly, however, that if you can compel a man to speak, you may, by that very compulsion, compel him to raise his voice in a scream which may be one of agony. A defendant has the right to stand mute in court. He may not even be forced to plead orally to an indictment. This is recognized by Rule 11, Fed.R.Crim.Proc., 18 U.S.C., which provides that 'If a defendant refuses to plead * * * the court shall enter a plea of not guilty.' Cf. Rule 12(a).
 
 
 32
 It may be argued that merely because an accused or a suspect, subsequently indicted, may not be compelled to exhibit or demonstrate his voice in a court that federal investigative officers may not use subterfuges, such as those employed by the FBI, the one-way mirror and the open transom for purposes of identification looking toward the solving of a crime and that the rules imposed upon investigative agents are not parallel or similar to those imposed in a criminal trial. It may also be asserted that obtaining a voice recording by subterfuge is not the equivalent of compelling a suspect to demonstrate his voice by the compulsion, physical or moral, of police officers. The latter courses might be prohibited by the Fifth Amendment while the employment of subterfuge might not. The FBI agents broke no law when they exhibited the appellants and their voices to the bank witnesses. The agents were faced with a difficult task of identification. We must weigh the public interest in the prosecution of crime against the rights of the suspect who may indeed be innocent. But, an involuntary exhibition or demonstration of a voice seems very close to one compelled by physical or moral compulsion. The dividing line is indeed thin. The FBI agents did not inform the appellants that their persons and their voices were being examined. On balance, however, we incline to the view that the arranged exhibitions by the FBI and the consequent identifications did not constitute compelled self-incrimination prohibited by the Fifth Amendment. Cf. Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966).
 
 
 33
 Other aspects of the arranged exhibitions cause us concern, however. There was no line-up. As we have said, at most two other men beside the individual appellants were present. The human mind is suggestible. The brief of the United States states in answer to the Massiah position asserted by the appellants that: 'This extension (of the Fifth Amendment prohibition) is urged as one of the grounds for the reversal of his (Scarbrough's) conviction even though each one of the persons who identified him at the October 18th interview also positively identified him at his trial.'[28] The comment seems to speak most potently in what it does not say. The bank witnesses had been shown numerous photographs. While the issue on this phase of the case is not a constitutional one it goes beyond mere credibility and to the conduct of the FBI agents. Does that conduct fall into the category of the principles enunciated by the Supreme Court in such cases as McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and, as was said by Judge Rives in Williamson v. United States, 311 F.2d 441, 444 (5 Cir. 1962), McNabb's progeny?[29] On balance, we are forced to the conclusion that the arranged exhibitions and demonstrations were not impermissible, albeit very close to the prohibited line.
 
 
 34
 The issue which we have just decided shades almost imperceptibly, we believe, into the next issue and must be dealt with also in terms of Escobedo and of our opinion in Russo and Bisignano. The FBI agents were aware that Scarbrough had a lawyer, Mr. Brown, who represented him at his trial in the court below.[30] The issues here shade from the Fifth Amendment into the Sixth for we think it can be assumed safely that counsel would not have permitted the respective appellants to be viewed and their voices to be demonstrated on October 18 and November 19, 1963. Directing our attention strictly to the Sixth Amendment issue, in view of the incriminating statements allegedly made by Scarbrough to the FBI agents on October 18 and November 19, 1963, it is obvious that questions arise under the decision in Escobedo and our decision in Russo and Bisignano, as to Scarbrough and perhaps also as to Chibbaro, for the record is silent as to what was said to the latter by the FBI agents and what he said to them in his interview of November 19.
 
 
 35
 It would be injudicious to decide such issues now. The present record is inadequate insofar as the pertinent facts are concerned. This is so perhaps because Escobedo and Russo had not been decided at the time of the appellants' trial. The constitutional issues involved are large ones. The appellants will have to be retried in the court below because of errors in the proceedings which will be discussed hereinafter. Constitutional issues should not be passed upon until it is necessary to do so and then upon an adequate record. Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885); United States v. Raines, 362 U.S. 17, 22-23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). At the new trial the court should make certain, so far as it be possible to do so, that the record is clear both as to the times, places and persons involved. As to statements made or alleged to have been made by either appellant in the nature of admissions or confessions the court might be well advised to pass upon their admissibility before presentation of such evidence to the jury.
 
 
 36
 B. The judgments of conviction of both appellants must be reversed and a new trial ordered for the reasons which follow.
 
 
 37
 As we have said, Scarbrough took the stand in his own defense. Agent Crowley testified on rebuttal. On cross-examination Scarbrough was asked by the Assistant United States Attorney if on October 18, 1963 he had not told the FBI that he had a 'small scar on his left cheek'. Scarbrough denied vehemently that he had made any such statement.[31] The trial judge then said, 'Scars can be mended.' Scarbrough's counsel, Mr. Brown, then moved for a mistrial, stating that the trial judge's interjection was unfair and prejudicial. At this point in the trial there was no basis in the record for such a statement by the trial judge, even assuming that the interjection was otherwise proper. The record seems clear that there was no blemish on Scarbrough's face at the trial. Agent Crowley testified that when he examined Scarbrough on October 18, 1963, there was a scar on Scarbrough's face. But this evidence came on the record by way of rebuttal and was not before the court when the trial judge made his comment. Crowley stated: 'I asked him his background * * * and I recorded his body build * * * (and) certain physical characteristics * * *; and in regard to scars, I asked him if he had any scars or marks. There was a scar on his left cheek, which I recorded.'[32] Putting aside any relation that this testimony might have had to Escobedo or Russo and Bisignano rulings, it could have been admitted only as evidence offered by the United States on its case in chief. Clearly, it was outside the scope of cross-examination. Scarbrough's counsel moved that it be stricken out, but the motion was not ruled on. The trial court itself correctly diagnosed the situation, viz., that the question and the answer were not within the scope of cross-examination but it took no corrective action. The Assistant United States Attorney said to the court: 'I asked this particular witness, sir, on cross-examination, whether or not he had a scar on his face and he said no.' The court then said: 'No, no, no. That's not the same. That's not rebuttal. Rebuttal is whether he (Scarbrough) said he had a scar and denied it on the stand. If he had a scar and denied it on the stand, that's rebuttal. But if it was this man's (Crowley's) observation of a scar at this time, I won't allow it.' The record demonstrates clearly that Crowley's answer that Scarbrough had a scar on his cheek was based on Crowley's own observation of Scarbrough on October 18, 1963. The FBI agent's observation, expressed in his testimony, should have been stricken from the record and the jury should have been directed to disregard it. The trial judge said: 'I won't allow it', but the evidence remained in the record and before the jury.[33]
 
 
 38
 We are aware that the order of admission of evidence lies in large part in the discretion of the trial judge, United States v. Alaimo,297 F.2d 604 (3 Cir. 1961),[34] but the issue of identification here was so acute, so evenly balanced, that upon a review of the whole record we are forced to the conclusion that there was an abuse of discretion by the trial court in permitting Agent Crowley's answer to stand. The remark of the trial judge, 'Scars can be mended.' was so prejudicial in itself as to require a new trial. The inference which the jury could draw was plain, namely, that the trial judge was of the view that Scarbrough had caused the identifying scar to be removed. The trial judge may within his discretion make appropriate comment upon the evidence but it is well settled that where improper remarks of the trial judge influence the jury and prejudice it against the defendant, it is reversible error on appeal. See United States v. Angelo, 153 F.2d 247 (3 Cir. 1946), citing Lau Lee v. United States, 67 F.2d 156 (9 Cir. 1933), and Lambert v. United States, 101 F.2d 960, 964 (5 Cir. 1939). Cf. Woodring v. United States, 311 F.2d 417, 420-421 (8 Cir. 1963), cert. denied 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963). The remark or statement of the trial judge referred to here seems to us to be of such a prejudicial nature that even a specific charge to the jury to disregard it would have been insufficient. Moreover, the charge to the jury given here was simply in the usual form that the jury was to be the 'sole judges of the facts'. The trial court went on only to charge the jury that 'You are to say what of the testimony you believe, what of the evidence you think has any weight. You are to determine what weight you will give to any testimony given by any witness. You have a right to recall the demeanor with which they testified. You have a right to consult yourself and ask what interest, if any, any witness had in testifying as he or she did * * *'[35] See United States v. De Sisto, 289 F.2d 833, 834 (2 Cir. 1961).
 
 
 39
 Scarbrough contends also that to permit Agent Crowley to testify that Scarbrough informed him that he was a 'holdup man' was prejudicial error. This evidence was also given in rebuttal, but Scarbrough had testified that he had not engaged in the robbery of the Wald-wick branch bank. We conclude that this testimony was given in proper order and was legally admissible.
 
 
 40
 The record also shows that the trial judge by a question propunded from the bench elicited the answer that the Oldsmobile automobile had been stolen. The court sua sponte should have directed the jury to disregard his question and its answer. It was prejudicial error not to have done so.
 
 
 41
 While Agent Linker was entitled to state what was found in the car he should not have been allowed to testify what the owner Weed stated to him as to what articles in the car were his. This was hearsay evidence and therefore inadmissible but we cannot consider this evidence to have been of such damaging consequence as to constitute reversible error.
 
 
 42
 Aside from the taint of hearsay in respect to Linker's testimony as to what Weed tole him, as set out in the preceding paragraph, an examination of the record respecting the admission of certain physical articles which were in the Oldsmobile discloses no prejudicial error. While the appellants insist that the court below erred in admitting, for example, the laundry bag and the hat on the ground that there was no proof that the laundry bag and the hat in the Oldsmobile were in fact used by the appellants in the course of the robbery, nonetheless it is our opinion that the identifications of the items admitted were legally sufficient. Caldwell v. United States, 338 F.2d 385 (8 Cir. 1964); Pearson v. United States, 192 F.2d 681 (6 Cir. 1951); United States v. Brazzell, 187 F.2d 878 (7 Cir. 1951), cert. denied, 342 U.S. 849, 72 S.Ct. 73, 96 L.Ed. 641 (1951), rehearing denied, 342 U.S. 889, 72 S.Ct. 171, 96 L.Ed. 667 (1951); White v. United States, 200 F.2d 509 (5 Cir. 1952), cert, denied, 345 U.S. 999, 73 S.Ct. 1142, 97 L.Ed. 1405 (1953), rehearing denied, 346 U.S. 843, 74 S.Ct. 17, 98 L.Ed. 363 (1953). For the sake of brevity further discussion respecting the problems presented by the articles taken from the automobile and admitted in evidence is set out in the footnote.[36]
 
 
 43
 Chibbaro alleges prejudicial error in respect to the statement which Agent Crowley testified had been made to him by Scarbrough that he, Scarbrough, was a 'hold-up man.' There was, however, no objection to the testimony or request by Chibbaro's attorney to strike this evidence.[37] Nor was there any request by Chibbaro's then attorney for a direction by the court that the jury should disregard the statement. Nonetheless, the court stated in its charge: 'There has been testimony here by a witness as to an admission made by one of the defendants, and I charge you that any admission allegedly made by any particular defendant is valid only against that particular person and not against anybody else. So that if you were to believe the testimony given by the witness who testified as to a conversation had with Chibbaro, it will apply to Chibbaro alone and not to Scarbrough.'[38] Chibbaro asserts that this charge was insufficient. There was no objection ti its sufficiency but putting aside the lack or objection or of specific request by Chibbaro's then counsel, we cannot say that the charge given to the jury that Scarbrough's alleged remark should be admissible and should be considered by the jury as to him alone, and not as to Chibbaro, was insufficient.
 
 
 44
 The last point, one which is asserted by Chibbaro, which requires discussion is that Clobridge's testimony was so completely unreliable in and of itself to justify a new trial. It is not necessary to pass upon this point for a new trial will be granted for the reasons already stated. We should point out, however, that if Clobridge testifies again doubtless he will be subject to searching cross-examination based not only on the material in the original record but also on that which has been brought upon the record by the post-conviction motion for a new trial, heard in the court below pursuant to our direction. We point out to the trial court that testimony of this sort may require a cautionary charge to the jury.
 
 
 45
 Other points raised by the parties do not require discussion.
 
 
 46
 The court desires to thank Matthew J. Ryan, Esquire, of the Philadelphia Bar who was designated by the court to represent the appellant Chibbaro in this court. Mr. Ryan's work has been excellently performed and we express our pleasure with his endeavors.
 
 
 47
 The judgments of conviction will be reversed and the case will be remanded for a new trial in accordance with this opinion.
 
 
 48
 APPENDIX
 ________
 SEQUENCE OF EVENTS
Record Reference Dates Events
70, 95, 213 August 19, 1963 (1) Bank robbery, 7 bank
 employees present.
240, 266, 551, 605 September 12, 1963 (2) Observation of Scarbrough
 at Hudson County Court
 House by some of bank
 employees.
101, 337, 449, 529 September 27, 1963 (3) 6 photographs shown to
 some of employees of bank
 (50 to 75 photographs had
 been shown to certain
 employees of the bank
 previously).
108, 531, 878 October 18, 1963 (4) Scarbrough observed
 through one-way mirror at
 FBI headquarters by bank
 employees.
 (5) Scarbrough was being
 interviewed by FBI at
 the same time.
904 (6) Scarbrough is alleged to
 have made the statement
 "I am a hold-up man."
969-72 (7) FBI agent is alleged to
 have observed scar on
 Scarbrough's left check.
 (8) The record does not reveal
 whether the bank employees
 heard the statement by
 Scarbrough that he was a
 hold-up man.
 (9) The record does not reveal
 whether there was a sound
 device which enabled the
 witnesses to hear
 Scarbrough.
451 (10) The record does reveal that
 the transom was open.
869 (11) Scarbrough was not asked
 any questions concerning
 the August 19, 1963 bank
 robbery.
110-11 November 19, 1963 (12) Chibbaro observed through
535 one-way mirror at FBI
 headquarters by bank
 employees.
869, 876 (13) Scarbrough also called into
 FBI office again for
 questioning. This time
 concerning the August
 19, 1963 bank robbery.
 However, the record does
 not reveal whether he
 was observed through the
 one-way mirror again.
 (Testimony respecting
 the second appearance
 of Scarbrough at the FBI
 headquarters comes on
 the record by way of
 rebuttal only).
744 Late (14) Clobridge and Chibbaro in
 November, 1963 same prison block.
 
 
 
 [1]
 Scarbrough's name is spelled in the indictment as 'Scarborough', and his name is so spelled from time to time in other pleadings and in the transcript. His name is also spelled occasionally as 'Scarbrough'. No point is made of how his name is spelled by any party to the proceedings and no question of identity is presented. We believe that 'Scarbrough' is the correct spelling
 
 
 [2]
 A 'Sequence of Events' with 'Record References', 'Dates' and 'Events' is attached as an Appendix to this opinion. We believe it will be some help in understanding the record in this case
 
 
 [3]
 It does not appear from the evidence precisely where the Oldsmobile was found following the robbery
 
 
 [4]
 Apparently sixty or more photographs were originally submitted. The record is in a state of sonfusion as to whether or not the six photographs were part of the sixty photographs originally submitted or whether, as we have suggested, they were other photographs. The photographs were not introduced into evidence
 
 
 [5]
 Some of the photographs were submitted to some of the witnesses on the same day as the robbery; in fact, on the night of the robbery. The six photographs were submitted to at least one of the witnesses as late as September 27, 1963. See, for example, the testimony of Hirzel, R. 628-29
 
 
 [6]
 The reason why Scarbrough was in the Hudson County Court does not appear from the record and is not relevant to his appeal
 
 
 [7]
 The witnesses could view only the back or side of Scarbrough from the rear of the court room. See, for example, the testimony of Brahs, R. 551
 
 
 [8]
 We understand from the testimony that the 'one-way mirror' was a piece of glass through which the bank employees could look into the adjoining room without being seen. The bank employees could also hear the appellants' voices. However, the record is almost completely void of evidence as to how their voices could be heard. The court asked Smith, 'Did you hear his (Chibbaro's) voice?' Smith replied, 'I could hear his voice very well. The transom was open.' R. 451. We do not know whether any device was used to amplify the sound
 
 
 [9]
 R. 969
 
 
 [10]
 R. 972
 
 
 [11]
 R. ,904
 
 
 [12]
 Cruz, on cross-examination, when a written statement made by him to the FBI was used for purposes of contradiction, stated: 'I said he had some kind of mark, a birthmark or a scar or something.' He reiterated the substance of this statemtent several times during the trial
 
 
 [13]
 R. 897, 898
 
 
 [14]
 R. 972
 
 
 [15]
 R. 883
 
 
 [16]
 R. 976
 
 
 [17]
 R. 892
 
 
 [18]
 There appeared to have been a typographical error on the numbering of the photographs shown to the witness by the FBI which further invalidated the witness's testimony
 
 
 [19]
 R. 741
 
 
 [20]
 We are unable to state what Agent Linker was referring to when he used the phrase 'that 302'. The reference may perhaps be to a list of articles or items in the automobile prepared by the FBI but we cannot be certain. See .linker's testimony, R. 353 et seq
 
 
 [21]
 The statement was not put in evidence
 
 
 [22]
 We think the following statement of Clobridge's is typical of his testimony in this respect at the trial. He was asked by Chibbaro's attorney: 'But you thought that you would get consideration on the sentence.' Clobridge answered: 'If I pleaded guilty, yes.' R. 763
 
 
 [23]
 Chibbaro's brief in this court quotes this letter and states that thereafter Clobridge petitioned to withdraw his guilty plea on the ground that he had been promised a sentence of not more than two years, and that following a hearing before Judge Bruchhausen his three year sentence was reduced to two years. Statements on counsel's brief which are not supported by the record cannot be considered. See Williams v. Murdoch, 330 F.2d 745 (3 Cir. 1964), note 3 cited to the text at 749. The trial court apparently did not believe it necessary to expand these pertinent matters more fully in the record. Nonetheless there is sufficient in the transcript of the hearing of February 19, 1965, the hearing before the court below on the motion for a new trial following our remand of October 20, 1964, to enable us to discuss the questions presented by Clobridge's various statements and positions but upon the new trial the record should be expanded to include all relevant material to make clear Clobridge's action in relation to Chibbaro
 
 
 [24]
 These three notes are in evidence, as well as a fourth note which need not be discussed here
 
 
 [25]
 See R. 63, transcript of February 19, 1965, on the hearing on the motion for a new trial
 
 
 [26]
 Certiorari has been applied for in the Russo and Bisignano cases
 
 
 [27]
 Speaking more particularly, Morris had been indicted and was awaiting trial for burglary and other related offenses. After Morris' indictment, the victim of a rape and robbery, crimes not included in the indictment, identified some of her belongings discovered in Morris' possession when he was apprehended. Morris was. thereafter, put into a line-up at a police station and viewed by the victim. This court held the viewing to be constitutionally permissible, 355 F.2d 710 (1965). Three judges dissented. See Judge Freedman's dissenting opinion, on petition for rehearing, and the very brief dissent of the present writer in which Judge Hastie joined. See also 79 Harv.L.Rev. 84 et seq. (1965)
 
 
 [28]
 See the brief of the United States at 9
 
 
 [29]
 See note 4, 311 F.2d at 444. Judge Rives cites Mitchell v. United States, 322 U.S. 65, 70, 71, 64 S.Ct. 896, 88 L.Ed. 1140 (1944), Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), all dealing with impermissible conduct of federal agents
 
 
 [30]
 The brief of the United, states avoids this issue. It states at 3, '* * * Scarborough seems to contend that the mere fact that the agents were aware that he had secured an attorney to represent him in a State court proceeding prior to the interview, but totally independent to the Federal investigation, tainted the issue with constitutional dimensions.'
 Agent Crowley testified as to the interview that he had with Scarbrough on October 18, 1963: 'He (Scarbrough) indicated that he did have an attorney, Mr. Raymond Brown, in Jersey City, and he felt that he had not reason to contact Mr. Brown unless he was arrested.' But Agent Crowley had another interview with Scarbrough on November 19, 1963 and on this occasion it was known to Agent Crowley that a detainer had been issued for Scarbrough. On this occasion Scarbrough was questioned as to the Waldwick branch bank robbery. He was warned of his constitutional rights on this occasion. Agent Crowley told Scarbrough that a detainer had been lodged against him for the robbery. It does not appear whether this information was given to Scarbrough at the beginning of the interview, at its end, or at some point in time between the beginning of the interview and its termination. At the new trial, this fact should be ascertained. The record does not show the date when the detainer was issued. See R. at 967, 972, 975 and 991.
 
 
 [31]
 We think it is possible that the Assistant United States Attorney confused the fact that Agent Crowley had noted that Scarbrough had a scar on his face at the time of his interview with Scarbrough on October 18, 1963. Crowley stated that he recorded this mark. R. 971-72
 
 
 [32]
 R. 971-72
 
 
 [33]
 R. 970-72
 
 
 [34]
 See authorities cited in United States v. Alamimo, 297, F.2d 604, at 607
 
 
 [35]
 The trial court used the word 'right'. We think the word 'duty' should have been employed in lieu of the word 'right'
 
 
 [36]
 As to the admissibility of the money wrappers, money, travelers checks and certain other articles found in the Oldsmobile, we state the following: Assistant manager Smith testified that the travelers checks found in the Oldsmobile were taken from the bank during the robbery on August 19. (R. 444-49). Head teller Brahs testified that the money wrappers had his 'date stamp' and his 'initials stamp' on them (R. 526). Brahs did not, however, state that these particular money wrappers were taken from the bank during the holdup. His identification of the wrappers is as follows: 'Q. You saw these straps on money the day of the holdup? A. Yes, I did. Q. Where did you see this money? A. I identified th is money, which was recovered by the FBI. It was around money I identified. Q. These straps were around money? A. Yes. Q. What is the date that appears on these straps, sir? A. August 12, August 12, this one I believe is July 25, July 25, July 24, 29th of July, and the 23rd of July. Q. Is that all in 1963? A. Yes, all in 1963.' (R. 526). Brahs also made a positive identification of the initials of a fellowemployee who was on vacation and whose cash Brahs, as head teller, had taken over. The Assistant District Attorney then asked Brahs if he put this money and the previously identified travelers' checks into a bag during the holdup. Brahs replied, 'Yes, that's right.' (R 527). The District Attorney might have inquired further and have secured a more positive identification as to the money found in the car and the wrappers vide Brahs' statement, 'It (the money wrappers) was around money which I identified.' There remains some weakness in the identification of the money wrappers and of the money itself, but we think that weakness was not sufficient to render the money or the money straps inadmissible as evidence. The money itself was never identified by serial numbers and perhaps could not be so identified
 The identification of the laundry bag and the black hat by the witnesses of the bank robbery can be summarized by stating that they were shown to be 'similar' to those used or worn by the bank robbers. (R. 333, 528, 433-34). One bank-employee witness, Gneiding, did identify the black hat as having been worn by one of the robbers. The Assistant District Attorney posed this question to Gneiding, 'I ask you whether or not you have ever seen that hat before. A. Yes, I did. Q. And where did you see that hat before? A. The heavier of the two men (Scarbrough) was wearing it * * *. Q. In the bank on August 19th? A. Yes.' (R. 213). The other bank-employee witnesses testified only that the laundry bag and the black hat taken from the Oldsmobile were similar to those taken into the bank by the robbers. Mrs. Suter testified that she saw Scarbrough get out of an Oldsmobile a few minutes after the bank robbery. (R. 274). All of the items in dispute were found by FBI Agent Lnker in the Oldsmobile on August 19, 1963.
 The standard of admission urged by Scarbrough would require a positive identification of each item worn or carried by a defendant in the perpetration of a crime. Theoretically the victims of a robbery would be required to place an identifying mark upon these items while the crime was being committed. Such an unreasonable burden is not the present standard. All that is necessary is that the items be sufficiently identified and linked to the defendant. The lack of positive identification goes to the weight to be accorded these items rather than to their admissibility.
 In Caldwell v. United States, 338 F.2d 385 (8 Cir. 1964), the defendant objected to the introduction into evidence of his hat and overcoat on grounds of irrelevancy. An overcoat was found in an abandoned car which was used by the robber and a hat in a nearby alley. These articles were identified by several witnesses as similar to the clothing worn by the fleeing robber. There was one additional fact present in Caldwell that is not present here. In Caldwell the defendant admitted ownership of both items to an FBI agent. The court in Caldwell concluded the items were relevant evidence in connecting the defendant with the crime, citing Headen v. United States, 115 U.S.App.D.C. 81, 317 F.2d 145 (1963), which held that articles found by officers on defendant's route of filght were properly admitted if 'sufficiently identified and linked to the defendant.' Caldwell v. United States, 338 F.2d at 390.
 In Pearson v. United States, 192 F.2d 681 (6 Cir. 1951), a prosecution for receiving and possessing stolen liquor in interstate commerce, as witness testified that he thought one of the defendants was wearing white gloves while driving the truck from which the liquor was stolen. There was evidence that someone had painted out the name of the owner on the truck. A pair of white paint-stained gloves was found in an automobile used by one of the defendants. A painst expert testified that the paint used on the truck was similar to that found on the gloves. The court admitted the gloves into evidence, albeit conceding that they were only 'loosely connected up'. The court went on to say that whatever weight was to be given to the testimony was to be determined by the jury. Id. at 696.
 In United States v. Brazzell, 187 F.2d 878 (7 Cir. 1951), cert. denied, 342 U.S. 849, 72 S.Ct. 73, 96 L.Ed. 641 (1951), rehearing denied, 342 U.S. 889, 72 S.Ct. 171, 96 L.Ed. 667 (1951), in a prosecution for kidnapping a blackjack was found in the defendant's home when he was arrested. The victim of the kidnapping testified that the defendant had beaten her with the 'same type' of blackjack. There was also testimony by a physician that the victim's injuries could not have been caused by blows from a fist or open hand. The court held it was within the discretion of the trial judge to admit the blackjack. However, the court went on to point out that the admission of the blackjack into evidence could have had no substantial effect upon the verdict of the jury and therefore even if it was improperly admitted into evidence the admission did not constitute reversible error.
 In White v. United States, 200 F.2d 509 (5 Cir. 1952), cert. denied, 345 U.S. 999, 73 S.Ct. 1142, 97 L.Ed. 1405 (1953), rehearing denied, 346 U.S. 843, 74 S.Ct. 17, 98 L.Ed. 363 (1953), the court, in a prosecution on an indictment charging burglary of a post office and a building used in part as a post office, held that tools and gloves found by a postal inspector within a few days after commission of the offense, hidden under grass about 1050 feet from a trailer in which the defendant lived were admissible. The court reasoned that, 'The jury had a right to infer that the tools were such as could have been used to effect the entry into the buildings.' It is our opinion that perhaps this case goes too far. There was evidence in the White case that the tools and gloves were closer to a residence than to the defendant's trailer. Perhaps too many equally rational inferences could be drawn from the discovery of the tools.
 In the instant appeals one fact is present which goes beyond the cases cited in this footnote. The travelers checks found in the Oldsmobile were positively identified as having been taken from the bank during the holdup. They were discovered in the Oldsmobile at about 2:30 P.M. August 19, 1963, the day of the holdup. (R. 653). The checks were clearly identified and Mrs. Suter's testimony links Scarbrough to the Oldsmobile. There therefore can be no valid objection to the admissibility of this evidence against Scarbrough. When an item which is positively identified is found only hours after the robbery and other items are found with it albeit these other items are not positively identified as being actually used in the robbery but nonetheless are similar to articles in possession of the robbers at the time of the offense, an inference is permissible by the triers of the facts that the similar objects were used in the robbery.
 Although no objection was made by Chibbaro's counsel to the admission of this evidence, it might perhaps be argued that there is no connecting link proved between Chibbaro and the Oldsmobile and that therefore the evidence should have been excluded as to Chibbaro. We cannot agree with such an assertion. There was sufficient evidence to identify Chibbaro as one of the robbers of the branch bank. Loot from the bank, such as the travelers checks, was positively identified as being found in the Oldsmobile. The evidence as to the travelers checks and the other articles found in the Oldsmobile admitted into evidence were admissible to prove that Chibbaro took part in the bank robbery. As was pointed out earlier, Chibbaro and Scarbrough were each charged as principals. There was no error here.
 
 
 [37]
 Chibbaro is represented on his appeal by counsel appointed by this court, different counsel than that who defended him at his trial
 
 
 [38]
 R. 1084